J-A11040-20

2020 PA Super 148

| O.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.B. | : | |
| | : | |
| Appellant | : | No. 1952 MDA 2019 |

Appeal from the Order Entered November 6, 2019
in the Court of Common Pleas of Adams County Civil Division at No(s):
2019-SU-0000477

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED JUNE 23, 2020**

A.B. ("Mother") appeals from the order entered November 6, 2019, in the Court of Common Pleas of Adams County, which awarded her and O.G. ("Father") shared legal and physical custody of their daughters, N.G., born in April 2011, and Y.G., born in February 2013 (collectively, "the Children"). We vacate the lower court's order and remand for further proceedings consistent with this Opinion.

Mother and Father are former spouses who separated in 2015 and divorced in 2017.  Notes of Testimony ("N.T."), 9/30/19, at 99, 105-106, 190. Prior to these proceedings, Mother and Father had an informal custody agreement in which Mother exercised primary physical custody and Father exercised partial physical custody.  N.T., 10/24/19, at 302-303.  It appears

_____

[*] Former Justice specially assigned to the Superior Court.

from the record that Father had partial physical custody as often as ten or eleven overnight visits each month. *Id*.

In March 2019, Mother began to withhold custody of the Children from Father. Mother claimed Father was not helping with his share of parental duties, such as driving the Children to school. Mother expressed concern for the Children's safety while they were in Father's care. N.T., 9/30/19, at 111-12; N.T., 10/24/19, at 303, 318. On April 30, 2019, Father filed a complaint requesting shared legal and physical custody. N.T., 9/30/19, at 112. On May 20, 2019, Mother filed an answer, new matter, and counterclaim, requesting primary physical custody and shared legal custody.

On May 22, 2019, the trial court entered an interim order, awarding the parties shared legal custody. While Mother retained primary physical custody, the trial court gave Father partial physical custody on alternating weekends from Thursday at 7:30 p.m. until Sunday at 7:30 p.m., and at other times by mutual agreement of the parties.

On September 30, 2019 and October 24, 2019, the trial court held hearings, which began with *in camera* interviews of the Children. The testimony of the Children was subsequently sealed. Both Children spoke positively about both Mother and Father and indicated that they love spending time with both parents and "credibly articulated positive experiences in both households." Trial Court Opinion (T.C.O.), 11/6/19, at 4. N.G., who was eight years old at that time, agreed that both Mother and Father performed parental duties. N.G. expressed a desire to spend equal time with her parents.

Similarly, Y.G., who was six years old at that time, agreed that she would like to spend more time with Father and added that she loves her paternal grandmother. *Id*.; T.C.O., 12/27/19, at 5-6 (citing Sealed Child *In Camera* Interviews, September 30, 2019)).

Both parents also testified at the hearings.[1] Father focused his testimony on his performance of parental duties and on asserting why he believed that an award of shared physical custody would be in the Children's best interests. Father testified that he prepares the Children's meals, washes their clothes, reads with them, helps them with homework, goes on bike rides with them, attends their extracurricular activities, and takes them on trips. N.T., 9/30/19, at 113-18, 126-38, 176; N.T., 10/24/19, at 346-47. Father also contended that shared physical custody would allow the Children to spend more time with their paternal grandmother and learn about their "roots." N.T., 9/30/19, at 122; N.T., 10/24/19, at 352. Father also contended that he could more aptly address the Children's behavioral issues and would focus more on their intellectual development than Mother does. N.T., 9/30/19, at 122-23; N.T., 10/24/19, at 352-53.

In an effort to rebut Father's request for shared physical custody, Mother criticized Father's parenting skills and judgment. Mother presented evidence that Father was convicted of two summary offenses after an incident in January 2016, during which he left the Children unattended in his car. ***See***

---

[1] Father also presented the testimony of the paternal grandmother, while Mother presented the testimony of her fiancé.

Exhibits M6, M7.  Mother expressed concern that Father rents out a room in his house but does not provide her with any background information regarding his tenants.  In addition, Mother asserted that Father takes the Children with him while he performs his second, part-time job as a rideshare driver and food-delivery person.[2]  N.T., 9/30/19, at 110; N.T., 10/24/19, at 281, 318.

Mother and Father also presented testimony regarding Mother's proposal to travel with the Children to Russia.  Mother was born in Russia and testified that she hoped to take the Children there to visit her parents, brother, grandparents, and other extended family.  N.T., 9/30/19, at 207; N.T., 10/24/19, at 293.  However, Mother reported that Father was unwilling to provide her with the Children's Russian passports, which the parties indicate are now expired.  N.T., 9/30/19, at 211.  Father testified that he was wary of letting Mother take the Children to Russia because she had once threatened to never let him see the Children again.  *Id*. at 169.  He expressed concern that Mother would take the Children to Russia and then remain there.  *Id*.  Mother denied that she had threatened to take the Children to Russia and never return.  *Id*. at 210.

---

[2] Mother presented numerous text messages to show Father's allegedly hostile and uncooperative attitude toward her.  Mother also claimed Father separates the Children during his custody time by sending one of them to visit their paternal grandmother.  *See* Exhibits M18-M98; N.T., 10/24/19, at 269-270, 305.  Mother testified that Father's habit of separating the Children "creates the fights and disagreements between the girls.  They [are] being treated differently, and [they] com[e] back upset about what's happening while they are in his care . . . ."  N.T., 10/24/19, at 305.

On November 6, 2019, the trial court entered an Order and Opinion awarding Mother and Father shared legal and physical custody of the Children. The trial court provided that the parties would share physical custody pursuant to a "2-2-3" schedule.[3] T.C.O., 11/6/19, at 5.

Importantly, the trial court also directed each parent to provide the other parent with the name and date of birth of any new adult household members living in their residence "so that the other parent can conduct a background check." Order, 11/6/19, at 6. In addition, the trial court prohibited Father from engaging in any part-time work during his custody time and provided that neither parent could travel with the Children outside the continental United States without the written consent of the other parent.

The trial court thoroughly analyzed the factors enumerated at 23 Pa.C.S.A. § 5328(a). While the trial court acknowledged that both parents contribute to their highly contentious relationship, the court also agreed that Mother had expressed valid concerns regarding the Children's safety based on Father's failure to sufficiently investigate the backgrounds of his tenants, and Father's willingness to bring the Children along with him while performing his part-time work. T.C.O., 11/6/19, at 2-6.

_____

[3] The trial court found that a "2-2-3" custody arrangement would work best with Father's work schedule as Father has time off on alternating Mondays and Tuesdays, alternating Wednesdays and Thursdays, and alternating weekends. T.C.O., 11/6/19, at 5.

However, the trial court did not believe that these issues would outweigh the benefits the Children would receive from a shared physical custody schedule. The trial court summarized its conclusions as follows:

> . . . [A]fter consideration of the above factors, Father has met his burden of proof that a schedule of shared physical custody is in the Children's best interest at this time. Father has demonstrated that he is available to spend time with the Children during the time he is requesting. Both parents are equally capable of caring for the Children, meeting their needs and getting them to school on time. We grant Mother's request for specific language to be placed in the Order regarding background checks for Father's roommates/tenants. We deny Mother's request to allow the Children to travel to Russia, or any other foreign country, unless both parties expressly consent in writing. We cannot encourage these parents enough to broker a peaceful relationship with one another sooner rather than later, otherwise their Children may be adversely affected in the long run.

*Id*. at 7.

Moreover, the trial court acknowledged that Mother had requested authorization to renew the Children's Russian passports and take the Children to Russia to visit her family. The trial court indicated that it "decline[d] to grant Mother's request" as Russia and the United States are not treaty partners under the Hague Convention on Civil Aspects of International Child Abduction. Opinion, 11/6/19, at 7. The trial court also relied on Father's testimony that Mother had threatened to take the Children from Father and never let him see the Children again.

On December 5, 2019, Mother timely filed a notice of appeal along with a concise statement of errors complained of on appeal.[4]

Mother raises the following claims for our review on appeal:

I. Did the Trial Court abuse discretion, commit error of law and/or record lacks/is against the weight of evidence to support findings of fact/conclusion of law as to Section 5328(a) factor nos. 1, 3, 4, 6, 7, 8, 10, 11, 12, 13, 15, and 16, as to fundamental right to travel?

II. Was [the] "presumption" for shared [p]hysical [c]ustody burst by Section 5238(a) factors and 4-year *de facto* and *de jure* status quo?

III. Did Father lack credibility while Mother is more credible?

IV. Did the Court fail to make a complete record on Section 5329(c); Father's tenant/adult household member not available to court (Father received court approval for telephone testimony) nor was Father's tenant/adult household member made available to home study reporter; Father's adult household member not vetted for Section 5329 charges, convictions, protective orders or Children and Youth Services involvement (which is not discoverable to Mother), in this jurisdiction or another?

V. Does high level of conflict between parents preclude equal shared physical custody?

Mother's Brief at 3 (citations omitted) (quoted verbatim).

_____

[4] On February 26, 2020, Mother requested an extension of time to file a reply brief and asked this Court to strike Father's brief, which had not been properly served on Mother. Mother further requested that this Court bar Father's counsel from oral argument, refer Father's counsel to the Disciplinary Board, fine Father, and award Mother counsel fees. On February 27, 2020, this Court granted Mother additional time to file a reply brief but deferred the remainder of her motion to the merits panel. Upon review, we deny the remainder of Mother's requested relief. Even assuming that Father initially failed to serve Mother with his appellate brief, Mother obtained a copy of the appellee brief and filed her reply brief on time. While we note with displeasure Father's delay in filing his brief, the sanctions Mother suggests are not warranted.

The following standard of review applies to custody appeals:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa.Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa.Super. 2014) (citation omitted). The factors that trial courts must consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a), as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

First, Mother challenges the trial court's findings regarding the Section 5328(a) factors. Mother contends that she has served as the Children's primary caretaker and criticizes Father by alleging that he does not perform parental duties, splits the Children up between himself and the paternal grandmother during his custody time, and sends Mother hostile text messages. Mother's Brief at 14-17.

Significantly, Mother also challenges the trial court's findings regarding Section 5328(a)(16) (allowing court to consider "any other relevant factor") wherein the trial court prohibited either parent from traveling with the Children outside the continental United States without the written consent of the other parent. Mother contends that the trial court's order violates her right to travel pursuant to the United States Constitution.

Mother cites a variety of authorities including international treaties and the Russian Constitution, which she suggests are applicable because the Children maintain dual Russian citizenship. *Id*. at 19. Regarding Father's concern that she could take the Children to Russia and remain there, Mother asserts that there was testimony during the hearing "that [she] proffered a bond, with collateral of her house" to ensure the Children's return. *Id*. at 18.[5]

---

[5] Notably, our review of the record did not reveal any testimony during the hearing to support Mother's claim that she "proffered a bond, with collateral of her house" to ensure the Children's return to the U.S. from Russia. Mother's

The trial court's findings regarding the Section 5328(a) factors are supported by the record. As detailed above, Father testified that he performs a variety of parental duties, such as preparing the Children's meals, washing their clothes, attending extracurricular activities, reading with them, helping with homework, going on bike rides with them, and taking them on trips. N.T., 9/30/19, at 113-18, 126-38, 176; N.T., 10/24/19, at 346-47. The Children corroborated Father's testimony during their *in camera* interviews. Based on this evidence, it was within the trial court's discretion to conclude that Father is equally capable of caring for the Children and that a shared physical custody schedule would be in their best interests. ***See V.B.***, 55 A.3d at 1197.

In addition, we discern no basis upon which to disturb the trial court's direction that neither parent may travel with the Children outside the continental United States without the written consent of the other parent. This requirement constitutes a *ne exeat* clause, which is defined as an "equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." *Black's Law Dictionary* (11th ed. 2019).

The Supreme Court of the United States has specifically held that a parent's *ne exeat* right, which it defined as the "authority to consent before

_____

Brief at 18. The issue of a bond came up only once during the hearing in a question posed by Mother's counsel to Father during cross-examination. Counsel asked Father if he would be comfortable with Mother taking the Children to Russia if she "would post a bond of a lot of money, like her house as collateral[.]" N.T., 9/30/19, at 170. Father stated that he was not "here about money," and counsel did not raise the issue again. ***Id***.

the other parent may take a child to another country," confers on the parent a "right of custody" under the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "Hague Convention"). *Abbott v. Abbott*, 560 U.S. 1, 5, 130 S. Ct. 1983, 1987, 176 L. Ed. 2d 789 (2010). By way of background, the Supreme Court has recognized the following:

> The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11. In 1988, the United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 42 U.S.C. § 11601 *et seq.* See generally *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989–1990, 176 L.Ed.2d 78 (2010).
>
> The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, S. Treaty Doc. No. 99–11, at 7. Article 3 of the Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Ibid*.

*Chafin v. Chafin*, 568 U.S. 165, 168, 133 S. Ct. 1017, 1021, 185 L. Ed. 2d 1 (2013) (citation omitted).

The Hague Convention defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The Hague Convention also states that rights of custody "may arise in particular

- 12 -

by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the country where child was "habitually resident" at the time of removal. Hague Convention, art. 3.

Although Mother claims that the trial court's inclusion of the *ne exeat* clause violated her fundamental right to travel, she does not distinguish interstate travel from international travel. While the Supreme Court has recognized that "[t]he constitutional right of interstate travel is virtually unqualified," "the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment" and thus, "can be regulated within the bounds of due process." ***Califano v. Aznavorian***, 439 U.S. 170, 176, 99 S. Ct. 471, 475, 58 L. Ed. 2d 435 (1978) (citations omitted).

In this case, the trial court granted Mother and Father shared physical and legal custody of the Children. The trial court expressed concern about the potential for Mother to abscond with the Children to Russia as Father testified that Mother had threatened to never let him see the Children again, Mother withheld the Children from Father in the past, and the parties have great difficulty cooperating with each other.

Based on these circumstances, it was within the trial court's discretion to include the *ne exeat* clause to instruct both parents not to take the Children out of the United States without consent of the other parent. Mother cites to no authority to support her position that this practice is unconstitutional.

- 13 -

Mother also suggests that the trial court's decision can be construed as a refusal to grant Mother's request to renew the Children's Russian passports. This Court was presented with a similar question in **Nagle v. Nagle**, 871 A.2d 832, 836 (Pa.Super. 2005), in which the father appealed the trial court's decision to order the parties to obtain dual citizenship and dual passports for their children. This Court held that the issue of obtaining passports for the parties' children was similar to a party's request for relocation, in which the trial court is permitted to act based on the best interest of the child. **Id**. This Court upheld the trial court's decision that dual citizenship and dual passports were in the best interests of the children and agreed with its finding that there was no merit to the father's claim that the children's mother was a flight risk. **Id**. at 838-39. This Court also indicated that its decision directing the parties to seek to obtain the Children's passports did not affect the parents' legal rights with regard to their children. **Id**.

The record is undisputed that the Children are dual citizens of Russia, the Children's Russian passports are expired, and the Children do not have U.S. passports. N.T., 10/24/19, at 361-62. Mother's parents, grandparents, brother, and extended family all live in Russia; Mother shared that she was having difficulty obtaining a visa for her mother to come to the United States. N.T., 9/30/19, at 264-66. The trial court set forth its rationale in its Rule 1925(a) opinion as follows:

> In the context of factor 16, we briefly discussed the narrow and discrete issue of Mother's request to renew the [C]hildren's Russian passports and take the [C]hildren to visit Mother's

extended family in the Russian Federation. Father objected to Mother's request. He testified that Mother verbally threatened to take the [C]hildren to Russia and never return. Mother denied making this statement. Father was born and raised in Ukraine. Mother was born and raised in the Russian Federation. The [C]hildren are dual citizens of the Russian Federation and the United States of America. We did not alter the [C]hildren's citizenship status. We did not affect Mother's ability to travel. We limited the [C]*hildren's* ability to travel to the Russian Federation absent an express written agreement of both parents. There were no alternative proposals proffered to the court, such as a proposed travel order with specific safeguards. Our decision was made upon evidence presented. We also noted our concern that the Russian Federation and the United States are not treaty partners under the Hague Convention on the Civil Aspects of International Child Abduction. Furthermore, Mother indicated that her travel plans are speculative at this time and she is currently not able to afford to make this trip. Mother did not demonstrate how granting her request would be in the [C]hildren's best interest at this time, particularly when Father cited a concern that Mother may withhold the [C]hildren.

T.C.O., 12/27/19, at 8-9 (citation omitted) (emphasis in original).

While the trial court concluded that Mother failed to present evidence to show that the renewal of the Children's passports is in their best interest, the trial court did not make any factual findings or offer any authority to support its claim that its restriction on the renewal of the Children's passports "did not alter the [C]hildren's citizenship status." ***Id***.

As such, we remand and direct the trial court to determine whether its restriction on the renewal of the Children's Russian passports would affect the Children's status as dual citizens of the United States and Russia. If such restriction would cause a loss of the Children's dual citizenship, the trial court is directed to allow the renewal of the Children's Russian passports while

requiring additional safeguards to prohibit those passports from being used without prior court approval.

In her second claim, Mother argues that the "[f]our-year *de facto*/[t]wo-year *de jure* status quo of primary physical custody to Mother/ partial physical [custody] to Father should not have been 'burst' nor 'modified.'" Mother's Brief at 22. Mother appears to argue that she exercised primary physical custody of the Children in the past, and that the trial court abused its discretion by disturbing this prior arrangement. Mother suggests that the trial court applied an impermissible presumption in favor of shared physical custody. ***Id***. at 23.

The trial court addressed this claim in his Rule 1925(a) opinion:

> The alleged *status quo* custodial arrangement made prior to the issuance of our interim order was at Mother's behest. The testimony elicited indicated that Father had substantial partial physical custody in 2017 and 2018, and that Mother unilaterally restricted his custodial time in the [*sic*] early 2019, which prompted him to file the instant complaint. This is not a case where the court is asked to modify a prior adjudication of custody and concomitant factors analysis. We are not bound by an interim order which was entered prior to a full hearing on the merits of the case. Even when a parent is simply asking the court to ratify an existing informal schedule, the trial court is still compelled to decide which physical custody arrangement is in the [C]hildren's best interest. This decision squarely implicates a consideration of all the § 5328(a) best interest factors. In adjudicating the instant matter, we did consider the evidence elicited regarding parties' various informal custodial arrangements, along with evidence of what occurred after the interim order was entered. We did so within the context of the §[]5328[(a)] factors as required. [I]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case.

T.C.O., 12/27/19, at 9-10 (citations and quotation marks omitted).

We agree with the trial court's analysis. Our custody statute does not include a presumption in favor of any particular award of custody. *See* 23 Pa.C.S.A. § 5323(a) ("After considering the factors set forth in section 5328 . . . the court may award any of the following types of custody if it is in the best interest of the child").

While the trial court could have awarded primary physical custody to one of the parents to provide greater stability for the Children, the need for stability and continuity is only one factor among many that a court must consider when making an award of custody. *See* 23 Pa.C.S.A. § 5328(a)(4) (directing that the court consider "[t]he need for stability and continuity in the child's education, family life and community life"). Moreover, the amount of weight that a court places on any one factor is almost entirely discretionary. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa.Super. 2013) ("It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case").

In this case, it was within the trial court's discretion to conclude that spending an equal amount of time with both Mother and Father would be in the Children's best interests and that the benefits the Children would receive by doing so would outweigh any disruption to their stability. *See V.B.*, 55 A.3d at 1197. Mother does not direct us to anything in the record to show the trial court applied an impermissible presumption favoring shared physical custody. As such, Mother's second claim does not entitle her to relief.

Mother's third claim is that the trial court erred or abused its discretion by finding Father's testimony credible and/or by finding Mother's testimony not credible, and that an "adverse evidence instruction, finding and conclusion against Father and in favor of Mother applies." Mother's Brief at 24. Mother waived this claim by failing to develop it in the argument section of her brief with citations to relevant legal authority. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa.Super. 2017) (stating that "this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority").

Moreover, even if Mother had not waived her claim, we would conclude that it is meritless. To the extent we can discern the substance of Mother's claim, she appears to be arguing that this Court should reverse the trial court's credibility determinations due to Father's alleged misrepresentations during the proceedings, such as his inaccurate averment in his custody complaint that he and Mother shared physical custody of the Children equally following their separation, when in reality he exercised only partial physical custody of the Children. Mother's Brief at 24-25.

As explained above, our case law provides that this Court must defer to the trial court's credibility determinations when the record supports them, as it does in this case. *See V.B.*, 55 A.3d at 1197. The trial court was clearly aware of the issues Mother raises in her brief, including Father's averment that the parties shared physical custody of the Children equally following their separation. Father testified that he believed he was exercising equally shared

physical custody of the Children in terms of the actual hours that he was spending with them, taking into account the time that they were in school or with a babysitter. N.T., 9/30/19, at 109-110.

To the extent that Father's testimony could be characterized as inaccurate, it was within the trial court's discretion to assess Father's credibility. Notably, the trial court found that Father's testimony at the hearing was consistent with the averments in his complaint as although Father did not exercise equally shared physical custody of the Children, he did exercise substantial partial physical custody. T.C.O., 12/27/19, at 9-10. We conclude that no relief is due.

Fourth, Mother argues that the trial court erred or abused its discretion because it did not determine whether Father's "Section 5329 drug and violence charged/convicted, [Protection From Abuse ("PFA")] abuser tenant/boarder posed a threat of harm to children nor make a complete record of same." Mother's Brief at 25. Mother asserts that Father's current tenant has a criminal record in Maryland and that, although he was not convicted of the charges, "[a]n adverse witness/evidence finding of fact/conclusion against Father and in favor of Mother should have been made." *Id*. She insists that the presence of Father's tenant by itself should preclude an award of shared physical custody. *Id*. at 26. Mother also contends that the trial court should have included a provision in its order directing that Father must supervise whenever the Children are in the tenant's presence. *Id*.

Our child custody statute provides as follows, in relevant part:

## § 5329. Consideration of criminal conviction

**(a) Offenses.--**Where a party seeks any form of custody, the court shall consider whether that party or member of that party's household has been convicted of or has pleaded guilty or no contest to any of the offenses in this section or an offense in another jurisdiction substantially equivalent to any of the offenses in this section. The court shall consider such conduct and determine that the party does not pose a threat of harm to the child before making any order of custody to that party when considering the following offenses:

\*\*\*

18 Pa.C.S. § 2702 (relating to aggravated assault).

\*\*\*

Section 13(a)(1) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, to the extent that it prohibits the manufacture, sale or delivery, holding, offering for sale or possession of any controlled substance or other drug or device.

23 Pa.C.S.A. § 5329(a).

The trial court addressed Mother's claim regarding Section 5329(a) in its Rule 1925(a) opinion, as follows:

Father resides in the townhouse where he and Mother lived with the [C]hildren when they were an intact family. Since the parties' separation, Father has leased a portion of the house to a non-family member. Father evicted the first tenant. Mother believes that we erred in failing to consider the testimony of Father's current tenant, Mr. [R.] Mr. [R.] was identified as a potential witness at the pre-trial conference. Neither party presented him for examination at trial. Evidence of criminal charges/protective orders against Mr. [R.] were not admitted into evidence and therefore not considered. . . . There was no evidence presented that this individual poses a risk of harm to the [C]hildren. To the contrary, the [C]hildren indicated that they are comfortable with Mr. [R.], he is kind to them, and Father does not leave them alone under Mr. [R.'s] supervision at any time. We also considered the home study of Father's residence performed by Adams County Children & Youth Services which indicated no safety concerns in

> Father's residence. However, out of an abundance of caution and with the goal of being pro-active regarding Father's future tenants, we felt it to be in the best interest of the [C]hildren to order that Father to keep [*sic*] Mother apprised of any new tenant's identity. This affords Mother the ability to discover relevant information about the tenant and raise any concerns with this court in the future.

T.C.O., 12/27/19, at 10-11 (citation to the record omitted).

The record contains little evidence detailing Father's investigation of the criminal history of his current tenant. Father attempted to address this issue on direct examination, testifying that he found out from the "opposite side" that his tenant had "some problems with the law," the most recent of which occurred in 2014. N.T., 9/30/19, at 101-102. Father testified that he would address this issue by either making the tenant "remove to the different level"[6] or move out of his home entirely. *Id*. at 101.

Father explained that he had previously only checked to see if his potential tenants were "on the list," apparently referring to the Megan's Law sexual offender registry, but that he would now also check any potential tenant for a criminal record. *Id*. at 205. On cross-examination, Mother's counsel asked Father whether he was aware that his tenant "had been charged with second degree assault . . . And he has a PFA and he has possession of marijuana [sic]?"[7] *Id*. at 184. Father stated that he was aware. Id.

---

[6] We presume that Father meant the tenant could move to a different level of his home.

[7] Mother also presented evidence showing Father's former tenant may have incurred criminal charges during his tenancy. N.T., 9/30/19, at 178-183. Father explained that he no longer rented to his former tenant because the tenant failed to pay rent and damaged the home. *Id*. at 102.

Thereafter, Mother's counsel moved to admit documents relating to the tenant's criminal record. Father's counsel objected, arguing that the tenant had been acquitted of the charges in one instance, and that the charges were *nolle prossed* in another instance. N.T., 10/24/19, at 336-37. Mother's counsel agreed to withdraw the exhibits. ***Id***.[8]

In light of this evidence, we agree with Mother's arguments in part. To the extent Mother contends that the trial court entered its order in violation of Section 5329(a), the plain language of the statute belies her claim. Section 5329(a) applies specifically to convictions, guilty pleas, and no contest pleas. The record does not reveal any evidence that Father's tenant has any relevant convictions or pleas pursuant to that subsection.

However, under the circumstances of this case, Mother is correct that the trial court abused its discretion by entering the custody order without an adequate review of Father's tenant. When awarding custody, Section 5328(a) provides that a court must place weighted consideration on those factors affecting the safety of the child or children. 23 Pa.C.S.A. § 5328(a).

Here, the trial court heard undisputed testimony that Father's tenant has a history of criminal charges, and a PFA order entered against him, which

_____

[8] The trial court did indicate at the conclusion of the hearing that it would admit Exhibit M17, a document relating to the alleged PFA order against Father's tenant, although that exhibit does not appear with the other exhibits in the certified record. N.T., 10/24/19, at 337. It appears that the reason for this is that the trial court did not include Exhibit M17 in its subsequent order listing the exhibits admitted at the hearing and directing that the Prothonotary place them under seal.

indicates that he may pose a risk of harm to the Children. There is no detail as to the extent of Father's investigation into his tenant's background. While a home study was completed of Father's residence, Father's tenant did not participate in this study.

Based on this record, we find the trial court did not make an informed decision that an award of shared physical custody would be in the Children's best interest and that the Children would not be placed at risk. Rather, the trial court is directed make a more detailed inquiry and finding concerning any risk to the Children after it has provided counsel the opportunity to cross-examine the particular tenant.

We also conclude that the trial court abused its discretion by failing to include provisions in its order sufficient to protect the Children's safety going forward, given Father's history of inadequate investigations of the background of his tenants. The trial court's order places the burden of investigating Father's tenants on Mother. T.C.O., 12/27/19, at 11 ("[W]e felt it to be in the best interest of the [C]hildren to order that Father to keep [*sic*] Mother apprised of any new tenant's identity. This affords Mother the ability to discover relevant information about the tenant and raise any concerns with this court in the future").

As Father receives the financial benefit of renting of accepting tenants into his household, he should incur the cost and burden of investigating his tenants. We remind Father that it is his duty to ensure the Children's safety

while they are in his care and that he should not take lightly any risk of exposing the Children to dangerous individuals.

Accordingly, we conclude that the trial court's order must also include a provision directing that Father must conduct a thorough background investigation of any potential tenant before allowing any tenant into his home and timely provide Mother with the results of such investigation. Mother would then have the opportunity to petition the trial court if she is not satisfied that Father has adequately sought to ensure the safety of the Children in his home while they are in his custody.

Lastly, as Mother and Father have a dysfunctional relationship, Mother argues that a shared physical custody schedule will increase conflict, which is unhealthy for the Children. She cites case law discussing the importance of cooperation when parents share physical custody.[9] Mother's Brief at 27-30 (citing **P.J.P. v. M.M.**, 185 A.3d 413 (Pa.Super. 2018)).

The trial court addressed the parties' contentious relationship as follows in its Rule 1925(a) opinion:

---

[9] Mother also suggests that the trial court erred by failing to do a myriad of other things, such as order a custody evaluation, order various forms of counseling for the parents and the Children, and appoint a guardian *ad litem* and legal counsel for the Children. Mother's Brief at 27. Mother further suggests that the trial court erred by failing to refer the family to the county child welfare agency for services. **Id**. Because Mother did not raise these issues before the trial court, and did not include them in her statement of questions involved or in her concise statement, she has waived them on appeal. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); **M.Z.T.M.W.**, 163 A.3d at 466 ("[I]ssues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived").

- 24 -

An amicable relationship between parents, although preferable, is not a prerequisite for a shared custodial relationship. In adjudicating this matter, we found that the level of conflict (factor 13) favors neither parent and that neither parent is likely to encourage the [C]hildren's relationship with the other parent (factor 1). Based upon our interview with the [C]hildren, it appears that the parents' negativity and disrespect of one another has not overtly bled into the [C]hildren's perception of the parents, nor has any parent caused alienation of the [C]hildren's affection for the other parent (factor 8). The [C]hildren look to both parents for love and security. They derive various benefits from their time with both parents. Both parents have a sincere interest in being involved in all aspects of the [C]hildren's lives. A shared schedule does not disrupt their educational or community stability. Both parents are well-educated, have stable employment and are able to provide for each child's basic needs. Both parents share a desire for their children to succeed in their endeavors and have supported them in their extracurricular activities. Our consideration of all the salient factors delineated in [Section 5328(a)], based upon the evidence adduced at trial and the credibility of the witnesses, has led us to conclude that it is in the best interest of the [C]hildren to share equal time with their parents.

T.C.O., 12/27/19, at 11-12.

The existence of a high-conflict relationship is only one of many factors that a trial court must analyze when considering an award of custody, and the amount of weight that a court places on any one factor is almost entirely within its discretion. *See* 23 Pa.C.S.A. § 5328(a)(13) (directing that the court consider "[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another"); *M.J.M.*, 63 A.3d at 339. The trial court in this case was clearly aware of the parties' contentious relationship and considered it when reaching its decision. Therefore, the trial court complied with the requirements of the law and our deferential standard

of review requires that we accept its findings and determinations.  ***See V.B.***, 55 A.3d at 1197.

Based on the foregoing analysis, we vacate the trial court's November 6, 2019 Order and remand for further proceedings consistent with this Opinion. As discussed *infra*, we deny Mother's request for sanctions in her application for extension of time to file a reply brief.

Order vacated.  Case remanded for further proceedings consistent with this opinion.  Request for sanctions in Mother's application for extension of time to file a reply brief denied.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/23/2020