J-A11034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| REBECCA L. NAKICH, NOW REBECCA L. COURTNEY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | No. 1402 WDA 2022 |
| BART P. TERRY | : | |
| | : | |
| v. | : | |
| | : | |
| ALPHONSE TERRY AND GAIL TERRY | : | |

Appeal from the Order Entered November 4, 2022
In the Court of Common Pleas of Somerset County Civil Division at
No(s):  No. 509 Civil 2010

BEFORE:  BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED: MAY 22, 2023**

Rebecca L. Nakich, now Rebecca L. Courtney (Mother) appeals from the November 4, 2022 order of the Court of Common Pleas of Somerset County (trial court) granting partial supervised custody to Bart P. Terry (Father) of M.B.T. (Child, born 2009).  Intervenors Alphonse and Gail Terry (Paternal Grandparents) were ordered to supervise Father's custody.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

We glean the following facts from the certified record. Mother and Father, who never married, entered into their first custody agreement for Child in 2010 when he was 11 months old. Mother has always maintained primary physical custody of Child and she and Father share legal custody. Due to his struggles with drug and alcohol addiction, Father has had partial physical custody or supervised visitation throughout Child's life. He has also been subject to random hair follicle and urinalysis drug testing under the various custody agreements.

Mother and Father entered the most recent custody agreement in 2019 following Father's arrest for possession of a controlled substance, possession of drug paraphernalia and a drug-related driving under the influence (DUI) charge. The agreement required Paternal Grandparents to supervise Father's custodial periods. Father was required to submit to hair follicle drug testing on request by Mother or the Child Custody Investigation Office, and any positive tests or alcohol or substance use during custodial periods would result in all future custody being supervised by the Alternative Community Resource Program (ACRP). After entering this agreement, Father tested positive for narcotics on a hair follicle test in March 2020. He did not exercise any partial custody of Child from that point forward.

In August 2021, Paternal Grandparents filed a petition to intervene requesting partial physical custody and averring that Mother had denied them

contact with Child for over a year. On January 28, 2022, the parties entered into a new custody agreement that granted Paternal Grandparents two hours of partial physical custody of Child every other week and one phone or video contact with Child during the off-week. Father was not permitted to be present during Paternal Grandparents' custodial periods. They were prohibited from speaking about Father to Child unless he initiated the conversation.

On April 22, 2022, Mother filed a petition to modify the custody order alleging that Paternal Grandfather violated the custody agreement. She additionally filed a contempt petition alleging that Paternal Grandfather had spoken to Child about Father in violation of the order and told Child to lie to Mother about the conversation. The trial court denied the contempt petition, finding no willful violation of the order. However, the parties proceeded to an evidentiary hearing on the modification petition on October 24, 2022. At the hearing, Mother sought to terminate Paternal Grandparents' periods of custody. The trial court stated at the beginning of the hearing that even though Father had not filed his own modification petition, it would consider modifying the prior custody order to allow Father to have supervised visitation through Paternal Grandparents. The trial court noted its concern that Child had been effectively isolated from Father and Father's family for a long period of time. Mother conceded that the trial court could modify Father's custody following the hearing if the evidence was so warranted, but opposed any modification to the requirement that visitation be supervised by ACRP.

The trial court began by speaking to Child about his preferences *in camera*. Child was 13 years old and had last visited Father approximately 2.5 years prior at a supervised visit with Paternal Grandparents. Child was still visiting Paternal Grandparents every other week and said that he did not ask them about Father because he did not like him or want to see him. Child said he stopped seeing Father when Father failed a hair follicle test, which Child learned about from Mother and her counsel. When pressed by the trial court, Child said that he may eventually want to learn more about Father but was not interested in doing so at that time. He could not explain why he did not want to develop a relationship with Father but denied that Mother would be opposed to supervised contact. He did not think Paternal Grandparents could supervise visits because Father had failed his hair follicle test when they were responsible for supervision previously. When the trial court asked if Child thought Paternal Grandparents could not protect him during visits, he could not answer. He maintained that Mother would not be upset if Child said he wanted to visit with Father. When asked how he felt about the current custody arrangement, Child said that he did not like it or want to visit with Paternal Grandparents. Child understood that the hair follicle test did not indicate that Father was intoxicated during periods of custody and said that Father had never done anything during custodial periods that had concerned him.

Next, Mother testified that she and Child live with her husband of ten years and their two children. Child also had a half-sibling on Father's side.

Mother had been Child's primary custodian for his entire life, and in Child's early years, the custody schedule was designed around preschool and work, with both sets of grandparents watching Child throughout the week. After Child began kindergarten, Father had custodial periods two evenings after school and on alternating weekends and Paternal Grandparents would pick up Child on some of those days. Father had been employed with a carpenters' union throughout Child's life.

Mother testified that the custody schedule became more difficult and Child suffered emotionally beginning in 2016 when Father separated from his then-wife. Child was upset about losing Father's wife from his life. Mother said that drug abuse had always been an issue in the custody case, and that she was not aware of the extent of Father's addiction until she was pregnant with Child. Father had been charged with multiple DUIs as a result of drug and alcohol use. While the first custody agreement provided for random drug testing, Mother did not believe the Child Custody Investigation Office had ever tested him. She had filed her petition to enforce the order after observing signs that Father was using again in 2017. At that time, his hair follicle test was positive for methamphetamine, cocaine and amphetamines. Father continued unsupervised visitation between 2017 and 2019.

Mother testified that she had asked Paternal Grandparents to supervise the visits voluntarily and they declined to do so. She had become concerned because Father's health appeared to be worsening. On one occasion, he

missed a custodial period with Child because he attempted to pick up his daughter while intoxicated and his ex-wife required him to obtain an alcohol screen pursuant to their custody order. Mother later learned that he was planning to retrieve Child for their visit after picking up his daughter.

Father was arrested in 2019 for possession of a controlled substance, possession of drug paraphernalia and DUI while he was on his way to pick up Child. At that time, Paternal Grandmother told Mother that they could not prove Father was driving under the influence because he refused the blood test. Mother asserted that Paternal Grandparents have both repeatedly denied that Father has a drug problem, have called her derogatory names and have insulted her in front of Child.

Ultimately, Paternal Grandparents were ordered to supervise Father's custodial periods in 2019. Father then tested positive once again for narcotics and, as a result, his custody time was to be supervised by ACRP. Mother testified that this sanction was included in the custody agreement because she was concerned Paternal Grandparents would not appropriately supervise the visits. She said they had previously allowed Father to take Child snowboarding when they were supposed to be supervising. She was concerned that Child would be exposed to dangerous narcotics if left unsupervised with Father. After Father tested positive for narcotics in March 2020, he did not exercise any periods of supervised custody, despite being able to do so through ACRP.

Mother said that at the time of the hearing, she believed Father was unemployed and he was not paying child support. She believed that visitation at ACRP cost $45 per visit. She said that he occasionally spoke with Child on the phone and had contacted him four times in the ten months prior to the hearing. Father did attend Child's baseball and basketball games. Mother said Paternal Grandparents texted her in May 2020 asking to see Child, and she responded that she was concerned that they could not keep Child safe and would not acknowledge Father's addiction or hold him accountable for his behavior. Mother said that Paternal Grandmother then tried to reach out to Child directly and responded to Mother by blaming her for the situation.

Mother ultimately told Paternal Grandparents they could visit Child at Mother's home or speak with him on the phone. They visited briefly on Halloween, Christmas and Easter to drop off gifts and Child spoke with them on the phone several times. Paternal Grandmother brought Father to the Christmas visit despite the order requiring his custody time be supervised by ACRP. Mother said Child was confused and angry after seeing Father unexpectedly at Christmas.

In the spring of 2021, Mother received a letter from Paternal Grandparents' counsel asking for visitation with Child under Father's former custody schedule. She and Paternal Grandparents then argued on the phone and Paternal Grandmother insisted that the hair follicle tests had been invalid. She said that they had done nothing wrong and Paternal Grandfather said that

a court should resolve the matter. Mother testified that she said she wanted them to have a relationship with Child if they could acknowledge Father's struggles with addiction.

Mother entered as an exhibit a poem Child wrote about Father in school in which he described worrying about Father and wishing that Father would get better for him and his half-sister. Mother believed Child would be uneasy if he began visiting with Father again without any proof that Father was sober. She testified that Child took a class in sixth grade about drugs and alcohol and asked Mother what substance Father used. He became very upset when she told him Father used methamphetamine and wanted to know why Father was not getting better or getting any help with his addiction. Mother believed that Father had avoided treatment for his addiction because Paternal Grandparents enabled him by performing custodial duties for him and hiding information about his drug use and criminal charges from Mother.

Mother testified that she encouraged contact between Child and Father until she began to suspect drug and alcohol use was affecting his ability to care for Child. At seven years old, Child told Mother that Father would sleep throughout weekend visits and that Paternal Grandmother would have to wake him up. In the spring and summer prior to the evidentiary hearing, Father would attend Child's sporting events and fall asleep on the sidelines. Father had been using Suboxone since he met Mother and throughout Child's life.

Mother testified that she has not gotten along well with Paternal Grandparents due to their failure to acknowledge Father's addiction. She did not feel that they respected her role as Child's mother. She said Child had reported that Father drank alcohol in the car while transporting him on one occasion. Father had not produced a negative drug test since he stopped seeing Child in March 2020 and had not performed parental duties other than paying child support since that time. Around that same time, Father sent Child a message blaming Mother for separating them.

On cross-examination, Mother conceded that Child was once close with Paternal Grandparents but stated that the relationship changed when Father was arrested. She believed that Child felt lied to about Father's addiction. Child attended therapy prior to Father's divorce and still spoke with the social worker at his school to discuss his feelings about the custody situation.

Mother admitted that hair follicle tests only indicate that a substance was consumed within 90 to 120 days prior to the test, and that she could not say with certainty that Father was under the influence during any specific custodial period. She said that she wanted Paternal Grandparents to form a relationship with Child independent of Father and to stop speaking about Father and excusing his behavior when they were with Child. She testified that Child is stressed by visits with Paternal Grandparents and expresses that he does not wish to visit or call them.

Mother did not believe Paternal Grandparents would know if Father brought narcotics into their home or would protect Child from that influence. She did not think they supervised visits appropriately in the past because they would not always remain physically present throughout the visit and would hide information from Mother when Father was using drugs. When asked if she would allow them to supervise custody if they subjected Father to breathalyzer and urine screens, she replied that she would not because they still could not understand the danger Father posed to Child.

When questioned by the trial court, Mother testified that she normally believes it would be in a child's best interest to have relationships with both sides of the family. However, she felt in this situation a relationship could be dangerous and would cause mental harm to Child. She believed that Paternal Grandparents needed treatment for co-dependency and to participate in Father's treatment in order to safely continue the two-hour visits with Child every other week.

Paternal Grandmother testified next. She was retired and had previously taught physical education and special education from 1972 until after Child was born. She did not have a criminal record. She testified that early in Child's life, she and Paternal Grandfather would frequently watch Child throughout the day while Mother and Father worked but the custody schedule became more formal in 2016 after Father's divorce. In 2019, Father was convicted of DUI and was sentenced to house arrest that was set to begin in

March 2020. Around the same time, he failed his hair follicle drug test and he had not seen Child since.

After the failed drug test, Paternal Grandmother testified that they waited a couple of months before retaining an attorney to pursue custodial time with Child. She wanted to see Child for longer periods, as the two-hour custody windows did not leave them enough time to do more than share a meal. She said they attend Child's baseball games but had to seek out the schedule themselves because Mother refused to share it with them. Communication with Mother was poor and Mother would ignore her messages requesting phone calls with Child. She said that they try not to sit near Mother when attending Child's games and denied that Father has ever fallen asleep at a game. She contended that Father was just looking at his cell phone.

Paternal Grandmother said that on the day Father was arrested for DUI, Paternal Grandfather had picked Child up from school and Father was driving home from work to visit him. When Father did not come home, Paternal Grandfather took Child to his baseball practice and Paternal Grandmother eventually received a phone call alerting her that Father had been arrested for DUI after he was found sleeping in his car. They then went to retrieve Father and left Child with his step-father at practice. Paternal Grandmother said she did not notify Mother of the DUI at that time because it was "blown out of proportion" and that nothing could be proven because Father refused the blood test. N.T., 10/24/22, at 160-61.

Paternal Grandmother acknowledged that Father had struggled with heroin addiction out of high school. He attended an intensive outpatient rehabilitation program and she attended family nights with him during that time. A couple of years later he went back for an inpatient program. Since 2019, he had been attending counseling two to three times per month and saw a doctor at a rehabilitation facility once or twice a month where he is drug tested. Paternal Grandmother testified that Father would be expelled from the program if he failed a drug test. Additionally, she randomly drug-tested Father with over-the-counter urinalysis tests. She denied enabling Father's addiction and said that she and Paternal Grandfather provide support so that he could manage fatherhood and work. She said that she learned to identify signs of intoxication and was very attuned to when Father was using narcotics. She said that she would not allow Father to see Child if she thought he was using drugs during any custodial time she supervised.

Paternal Grandmother said that she contacted Mother to arrange visits with Child over various holidays since March 2020 but was only allowed brief visits when she dropped off gifts. She believed that Child was quieter when Mother was present for phone calls and visits and more talkative when she was not. They have a bedroom for Child to use when he visits overnight.

On cross-examination, Paternal Grandmother testified that Father began Suboxone treatment in 2004 and continued to use it 18 years later. She said it was a maintenance drug that had kept him alive through that time.

She was aware that he tested positive for methamphetamine and cocaine in 2017, which was related to his DUI. She admitted that she could not always tell when he was using methamphetamine but would look for signs such as glassy eyes. She said that when he was charged with DUI, he was not driving to pick up Child but rather was going to meet him at her home. She said that Father had not seen Child since March 2020 because Mother had prohibited it, but admitted that Father was entitled to supervised visits at ACRP. She said supervised visits were difficult to schedule and that ACRP charged $70 per hour for visits. Paternal Grandparents were lending him money to meet his child support obligations but he had not asked for money for visitation.

Paternal Grandmother acknowledged that Father had not produced a negative drug screen but contended that he was taking a medication for depression that produced false positives for amphetamines. She believed that he was doing well and not using illegal narcotics at the time of the hearing. He was still on parole for his most recent DUI.

Paternal Grandfather testified that he was also retired but had previously worked as a construction superintendent and football official. He currently worked as a ski instructor and had no criminal history. He said that he had been very close with Child when they had periods of custody in the past and enjoyed attending Child's practices, games and school recitals.

Paternal Grandfather did not deny that Father suffered from addiction but said that he was currently doing well in regular counseling. He said that

- 13 -

Father is drug tested regularly and that he did not understand why the hair follicle tests were not consistent with his other drug analysis tests. He said they were attempting to change his prescription medications so that he could pass the drug tests. He had not observed Father under the influence during any custodial periods and said that he had never suspected that Father brought illegal substances into his home.

Paternal Grandfather said that he wanted to have a regular role in Child's life again. He acknowledged that there was some hostility in his relationship with Mother but denied making any derogatory comments about Mother in front of Child. On cross-examination, Paternal Grandfather said that Father kept getting false positive hair follicle tests because of his prescription medications. He believed Mother was influencing Child to say that he did not want to visit with Paternal Grandparents.

Finally, Father testified that he was currently laid off from his job as a carpenter but had recently had his driver's license reinstated. He said that he could not currently afford to pay for supervised visitation through ACRP and when he was employed, his work schedule prevented him from scheduling visitation. He had been sober from illegal narcotics for over a year and was regularly attending counseling. He was attempting to change his anxiety medication to prevent false positive results on his hair follicle tests. He denied falling asleep at Child's sporting events or ever using alcohol or narcotics at supervised visits with Child. He had not used drugs in Paternal Grandparents'

home or brought them into their home since he was a child. He said that he would like to resume visitation with Child supervised by Paternal Grandparents and said that he currently has visitation with his daughter.

On cross-examination, Father admitted that he had never called ACRP to try and schedule visitation but had assumed that they would only be available in normal business hours. He said that he still took Suboxone but had discontinued Wellbutrin because he believed it was responsible for the false positive drug tests for amphetamines. He had recently begun taking medication for ADHD, for which he was diagnosed in 2018. He had been employed for a couple of months in 2022, nine months in 2021 and off-and-on in 2020. He denied having custody of Child while under the influence and said that he took breathalyzer tests prior to visits with Child in the past. He said that Paternal Grandparents would be able to tell if he was under the influence.

On questioning by the trial court, Father asserted that when he produced false positive tests through his rehabilitative services, they sent the sample for further testing in a laboratory. He said that if he were actively using illegal narcotics, he would be terminated from the program. He agreed that he would have to work to reestablish a relationship with Child and would not be able to immediately exercise unsupervised overnight or weekend custody.

Following the reception of the evidence, the trial court entered an order modifying the prior custody agreements. The trial court explained that it

wanted to create a new custody order that would allow Father visitation supervised by Paternal Grandparents in order to facilitate a relationship between Child and Father's family. Accordingly, Father was granted partial custody to be supervised by Paternal Grandparents one day every other weekend from noon to 7 PM, and increasing to one day every weekend beginning in the summer. At least one of the Paternal Grandparents were required to be physically present during visitation and Father was required to be present unless otherwise agreed to by the parties. Holiday schedules would be mutually-agreed upon by the parties and all other terms of the previous agreements would remain in effect.

Mother timely appealed and she and the trial court complied with Pa. R.A.P. 1925.

## II.

On appeal, Mother argues that the trial court erred and abused its discretion by (1) granting Father periods of partial custody; (2) determining that Paternal Grandparents could appropriately supervise Father's custody; and (3) crafting a custody order that denied Mother any complete weekend of custodial time beginning in the summer.[1]

---

[1] When reviewing a custody order,

> our scope is of the broadest type and our standard is an abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not

*(Footnote Continued Next Page)*

When deciding a petition to modify custody, the trial court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors[2] set forth in the Child Custody Act, 23 Pa.C.S. § 5321

---

include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court s deductions or inferences from its factual findings. Ultimately, the test is whether the trial court s conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law or are unreasonable in light of the sustainable findings of the trial court.

**_C.R.F. v. S.E.F._**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

[2] The relevant factors are:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

*(Footnote Continued Next Page)*

*et seq.* ***See E.D. v. M.P.***, 33 A.3d 73, 80 (Pa. Super. 2011). However, "[i]t

is within the trial court's purview as the finder of fact to determine which

_____

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

factors are most salient and critical in each particular case." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa. Super. 2013). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

### A.

In her first argument, Mother highlights that Father has been addicted to narcotics since high school, used Suboxone for 18 years, continued to fail drug tests and incurred criminal charges as a result of his addictions. She contends that he continued to abuse drugs when Paternal Grandparents were supervising his custody of Child and then declined to visit with Child at all after ACRP took over responsibility for supervision. She contends that he regularly missed visits with Child or slept through them and that he only had brief phone contact with Child four times in the ten months preceding the evidentiary hearing. She argues that the trial court disregarded Child's preference not to see Father until he was sober. She maintains that the trial court ignored Paternal Grandparents' prior failures to supervise Father and did not acknowledge that Father was at fault for declining to exercise his custodial rights since 2020.

Mother cites no law in support of her position, nor does she couch her argument within the terms of our well-settled standard of review. ***See*** Pa. R.A.P. 2111(a), 2119(a), (b), (c) & (d); ***In re M.Z.T.M.W.***, 163 A.3d 462,

465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Rather, she recasts the evidence by largely crediting her own testimony and asserts that because the trial court found no custody factor weighing in Father's favor, any contact with Father would not be in Child's best interest. Our review of the trial court's opinion reveals that it carefully weighed all of the required factors and did not downplay the severity of Father's addiction, but ultimately concluded that it was in Child's best interest to develop a relationship with Father and his family. The supervised custody with Paternal Grandparents balanced the need to ensure Child's safety and Father's right to maintain a relationship with Child.

As Mother recognizes, the trial court addressed each of the statutory custody factors in its opinion in support of the order and found that many of them favored her continuing as primary custodian. The trial court agreed with Mother that Father was in active addiction and that his excuses for not exercising custody for over two years were incredible, as Paternal Grandparents were supporting him financially during his periods of unemployment. *See* Memorandum Opinion and Order, 11/4/22, at 7. However, the trial court found Mother's insistence on allowing Child to dictate the visitation schedule with Paternal Grandparents and Father to be unreasonable and not in his best interest. It was concerned that Mother had isolated Child from Father's side of the family and concluded that a 13-year-

old should not have sole discretion to decide if or when to have a relationship with Father and Paternal Grandparents.

Further, the trial court repeatedly noted that it did not find Mother completely credible and that her grievances against Father and Paternal Grandparents were not supported in fact. *Id.* at 8 ("Mother's expression of concern regarding the safety of the child is not justified. Mother's hostility towards the paternal grandparents and the father is prevalent and the historical blame towards paternal grandparents for supporting father has been misinterpreted as enabling his addiction."); *id.* at 10 ("We find that mother has been unduly restrictive in dismissing opportunities for the paternal grandparents to visit with the child and has misinterpreted paternal grandparents' efforts to support their son's addiction reform as enabling the drug use."); *id.* at 13 ("Any expression of a desire to include the paternal grandparents would be met with perceived disappointment by mother, which the child wishes to avoid. Testimony revealed that the remote conversations the child had with paternal grandparents were stilted with mother's presence as opposed to when the visitation took place in person with paternal grandparents."); *id.* ("[M]other has been adamant about creating false narratives about the potential risk factors of child's interaction with the paternal grandparents."). Thus, while the trial court agreed that Father continued to struggle with his addiction and was not ready to resume

unsupervised contact with Child, it also concluded that Mother's fears about Child's safety during supervised visitation were overblown.

This finding was supported by the record, as there was no evidence presented at the hearing that Paternal Grandparents had ever allowed Father to be in contact with Child while under the influence of drugs or alcohol.[3] The trial court noted that both Paternal Grandparents had held jobs that required clearances for working with children and credited Paternal Grandmother's explanation that she had learned the signs of drug use by participating in family sessions in one of Father's treatment programs. While the trial court held that Father would have to work toward unsupervised periods of custody, it concluded that it was not in Child's best interest to be cut off completely from Father while he was in recovery.

Merely holding that most of the custody factors favor Mother does not lead to the inexorable conclusion that Father and Paternal Grandparents should be denied all contact with Child. To the contrary, the trial court focused on whether it was in Child's best interest to foster a relationship with Father, Paternal Grandparents and the rest of Father's extended family, as is required by the Child Custody Act. *E.D.*, *supra*. Sitting as the fact-finder, the trial

---

[3] Mother repeatedly references Father's failed hair follicle test in March 2020, but acknowledges that the test only indicates that he ingested substances at some point in the 90 days prior. The test simply does not establish that Father was under the influence of narcotics during a supervised visit with Child and Paternal Grandparents.

court was entitled to assess the credibility of Mother, Father, Child and Paternal Grandparents and determine that Child's best interests were served by attempting to foster a bond with Father and his side of the family and that Child would not be endangered by supervised visits with Father. ***O.G. v. A.B.***, 234 A.3d 766, 777 (Pa. Super. 2020) (citation omitted) (explaining that the weight the trial court grants to the various custody factors "almost entirely discretionary."). The trial court's factual findings are supported by the record, and we cannot conclude that the relatively small amount of supervised visitation granted to Father and Paternal Grandparents—seven hours every other week, increasing to weekly in the summer—was an abuse of discretion. The issue merits no relief.

**B.**

Next, Mother argues that the trial court erred by finding that Paternal Grandparents could appropriately supervise Father's periods of custody. She maintains that Paternal Grandparents previously refused to supervise Father, despite exercising his periods of custody in his stead. She highlights that Father incurred criminal charges resulting in Paternal Grandparents supervising his visits by necessity, but continued to test positive for illegal narcotics. She contends that Paternal Grandparents failed to protect Child because they did not notice or acknowledge Father's drug use and continued to believe that his drug test results were false positives. She argues that the testimony at the hearing established that Mother and Paternal Grandparents

cannot communicate effectively and that Paternal Grandparents would continue to hide information about Father's addiction. She claims that Paternal Grandparents cannot tell when Father is under the influence or actively using narcotics and, thus, cannot safely supervise his custody of Child.[4]

Again, Mother's argument attacks the trial court's factual findings, as she focuses on whether Paternal Grandparents acknowledge Father's addiction, enable his behavior or can recognize when Father is under the influence of narcotics. After viewing all the testimony, the trial court specifically concluded that if they were appointed as supervisors of Father's custody, Paternal Grandparents would not allow Child to be placed in danger. Memorandum Opinion and Order, 11/4/22, at 11, 15. Paternal Grandparents agreed that Father struggles with addiction and supported his recovery by driving him to counseling, lending him money for child support and attending family treatment sessions with him in the past. Moreover, they had a close relationship with Child in the past and endeavored to maintain a presence in

_____

[4] In closing, Mother makes a cursory, one-sentence assertion that by finding that Paternal Grandparents were not "parties" to the proceeding, the trial court "avoid[ed] measuring his conclusions against the clear and convincing evidentiary standard required to defeat Mother's objections to their role." Mother's Brief at 43. As she has failed to develop this claim in any meaningful fashion, it is waived. *See Commonwealth v. Patterson*, 180 A.3d 1217, 1229 (Pa. Super. 2018) (holding that failure to include citation to relevant authority or to develop issue in any other meaningful fashion capable of review results in waiver of claim).

his life even without regular visitation. While Mother speculated about whether Father could bring narcotics into Paternal Grandparents' home or they could recognize signs of his intoxication, there was ultimately no evidence that Paternal Grandparents had ever allowed Father to exercise custody or visitation with Child while under the influence.[5] The trial court determined that Paternal Grandparents are able to recognize when Father is under the influence of any substance and would appropriately supervise Child to shield him from any risk posed by Father's addiction during the relatively short periods of custody. We discern no abuse of discretion.

## C.

Finally, Mother provides one paragraph of argument in support of her claim that the trial court erred by denying her any full weekends of custody beginning in the summer of 2023. She complains that the trial court deprived Mother of full weekends of custody in favor of Father, even though Father had declined to exercise custody for over two years prior to the hearing.

In addressing this claim, the trial court noted that the modified custody order left in place all provisions of the prior orders that were not affected by the modifications. *See* Order, 11/4/22, at 18. A previous consent order

---

[5] Paternal Grandmother testified that she administered home drug tests to Father in the past prior to periods of custody. The failed hair follicle tests that Mother relies upon could not establish that Father used narcotics while exercising custody of Child, or even that he had been under the influence in the presence of Paternal Grandparents.

between the parties included a provision allowing each parent two non-consecutive weeks of vacation throughout the year that would supersede the other provisions of the custody and holiday schedule. *See* Order of Court, 10/5/17, at 4-5. Thus, the trial court noted that Mother is still entitled to full weekend custody during her vacation time. Mother did not address this argument in her brief, nor did she explain why it was an abuse of discretion to allow Father to see Child for seven hours each weekend when she retains all other periods of primary physical custody. No relief is due.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/22/2023