J-A29001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| H.H.N.P. | : | |
| | : | |
| Appellant | : | No. 646 WDA 2021 |

Appeal from the Order Entered May 3, 2021
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD13-006087-008

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED: JANUARY 25, 2022**

H.H.N.P. (Mother) appeals from the order entered on May 3, 2021, by the Court of Common Pleas of Allegheny County that awarded D.S. (Father) sole legal custody and primary physical custody of M.A.D. (Child), born in January of 2013.  Mother was awarded partial physical custody of Child in accordance with a schedule delineated in the order.  The order also held Mother in contempt of four prior orders of court.  After careful review, we affirm the trial court's custody order.  However, we deny Father's applications to quash and to dismiss this appeal and also deny his request for counsel fees.

Before considering the merits of Mother's appeal, which she filed on June 4, 2021, we reviewed this Court's docket and note that Father filed both an application to quash and an application to dismiss this appeal.  Specifically,

_____

[*] Retired Senior Judge assigned to the Superior Court.

on June 10, 2021, Father filed an application to quash, and on June 21, 2021, Mother responded. This Court's order, dated July 8, 2021, denied the application to quash without prejudice, thus, allowing Father to file a new application to quash after the appeal was assigned to a merits panel. Then, on August 31, 2021, Father filed the application to dismiss, and Mother filed an answer on September 10, 2021. The application to dismiss was deferred to the merits panel. Thereafter, Father renewed his application to quash Mother's appeal, which was granted by this Court in an order dated November 17, 2021. Following Mother's application to reconsider the order granting the quashal and Father's response, this Court vacated its November 17, 2021 order and deferred the quashal issue to the time of disposition by the merits panel. As a result, the case was relisted for argument on December 14, 2021.

To begin, we deny Father's applications to quash or to dismiss Mother's appeal. We disagree with Father that Mother's appeal was untimely and, therefore, deny his application to quash. Mother filed her appeal within thirty days of the trial court's issuance of the May 3, 2021 final order that amended the April 21, 2021 order. We also deny Father's motion to dismiss. Although Mother's Rule 1925(b) statement is lengthy and her brief fails to comply with our Rules of Appellate Procedure, our review is not impeded. *See Jacobs v. Jacobs*, 884 A.2d 301, 305 (Pa. Super. 2005) ("This Court has held that the rules of appellate procedure are 'mandatory, not directing' and it is within our discretion to dismiss an appeal when the rules of appellate procedure are violated. However, if the failure to comply with rules of appellate procedure

does not impede review of the issues or prejudice the parties, we will address the merits of the appeal.") (citation and some quotation marks omitted). Moreover, it is the consensus of this merits panel that emphasizing the trial court's reasoning underlying its determination may be more appropriate and helpful to Mother in the months and years ahead. Additionally, we recognize that in a prior appeal to this Court, Father's motion to dismiss was granted. *See D.P.S. v. H.H.N.P.*, No. 1692 WDA 2016 (Pa. Super. filed Feb. 9, 2017) (order granting motion to dismiss appeal but denying request for counsel fees). We likewise deny Father's request for counsel fees.

We now turn to the issues raised in Mother's appeal and proceed to review the merits, which have been appropriately addressed by the trial court. The relevant scope and standard of review in custody matters are as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted). Furthermore, we note that:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given

- 3 -

the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

*A.H. v. C.M.*, 58 A.3d 823, 825 (Pa. Super. 2012). Moreover, "[w]hen a trial court orders a form of custody, the best interest of the child is paramount."

*S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted).

Mother raises the following issues for our review:

FIRST: Whether the four contempt adjudications were sufficiently proven, and whether the individual or collective result of those contempts could justify the [c]ourt's intention to "craft an order that makes it a little less opportune for instability and lack of continuity to occur."

SECOND: Whether the Burger King – Meadows Casino incident where Mother's children were left in the care of an older sibling was sufficiently proven to be given custody-factor weight and whether the result of that incident was sufficient to justify the [c]ourt's intention to "craft an order that makes it a little less opportune for instability and lack of continuity to occur."

THIRD: Whether alleged instability in Mother's home environment, whether alleged instability in Mother's psychology, whether Mother's alleged parental alienation syndrome, whether Mother's alleged "economic dishonesty[,"] and whether Mother's alleged moral turpitude were sufficiently proven to be given custody-factor weight and whether the result of that incident was sufficient to justify the [c]ourt's intent to "craft an order that makes it a little less opportune for instability and lack of continuity to occur."

FOURTH: Whether it was improper for the [c]ourt to delegate to Father the ability to modify/punish for contempt, without a judicial hearing.

Mother's brief at 9-10 (footnotes omitted; capitalization in original).

In its opinion filed following the custody hearing, the trial court provided a factual and procedural history of the case. *See* Trial Court Opinion (TCO), 7/7/2021, at 1-2. The opinion also referenced the court's reading into the record its analysis of the custody factors set forth in 23 Pa.C.S. § 5328. *Id.* at 2. This reading took place at a hearing on April 21, 2021, which was held remotely due to the pandemic. The court also noted that Mother was "removed from the remote hearing due to her failure to follow my admonishments and those of her lawyer to keep silent[.]" *Id.* at 2 n.3. The opinion also discussed the facts it relied on and its reasons for awarding Father sole legal custody and primary physical custody. *Id.* at 7-11.

Essentially, Mother's arguments are requesting that this Court re-find facts and re-weigh the evidence presented. However, our standard of review does not permit us to function in this manner. Rather, our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012). Moreover, we "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa.

Super. 2011). We do not conclude that that is the situation here. The trial court's findings are based on competent evidence contained in the record and its conclusions are not unreasonable.

We have reviewed the certified record, the parties' briefs, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Cathleen Bubash of the Court of Common Pleas of Allegheny County, dated July 7, 2021. We conclude that Judge Bubash's opinion properly disposes of the issues presented by Mother in this appeal. Accordingly, we adopt the trial court's opinion as our own and affirm the custody order on that basis.

Order affirmed. Application to quash denied. Application to dismiss denied. Request for counsel fees denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2022

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

D.S.,

        Plaintiff,

    v.

H.P.

        Defendant.

Opinion

Sup. Ct. No: 646 WDA 2021

FD 13-006087

**FILED**

JUL - 7 2021

CIVIL/FAMILY DIVISION
DEPT. OF COURT RECORDS
ALLEGHENY COUNTY, PA

Clerk

BY:

Honorable Cathleen Bubash
440 Ross Street
Suite 5036
Pittsburgh, PA 15219

COPIES TO:

Counsel for Plaintiff:

John M. Schaffranek, Esq.
Lisa Marie Veri & Associates
Manor Building, Penthouse Suite
564 Forbes Ave
Pittsburgh, PA 15219

Counsel for Defendant:

Joseph Chester, Esq.
Caplan & Chester
1309 Law & Finance Building
429 Fourth Ave.
Pittsburgh, PA 15219

**23**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

Plaintiff,

v.

H.P.

Defendant.

Sup. Ct. No.   646 WDA 2021

No.:  FD-13-006087

## OPINION

Judge Cathleen Bubash                                            July 7, 2021


H.P. (hereinafter "Mother") appeals from my May 3, 2021, Custody Order entered after trial on D.S.'s (hereinafter "Father") petition for modification and four contempt petitions. I found Mother in contempt and imposed sanctions. On the custody modification, I reduced Mother's custody time, not as punishment for her contempt, but because I found, based on the evidence presented, that reduction to be in the child's best interest. My Order should be affirmed.

## Background

The parties have a daughter, M.A.D., d.o.b. 1/5/2013, (hereinafter "Child")[1]. Mother and Father have been involved in litigation since subject Child was born. They have been operating under a Custody Order entered after trial in 2016.[2] My Order of October 4, 2016, Order gave Father primary physical custody and Mother three weekends per month, and a weeknight visit. The parties shared

---

[1] Mother has three older children who are not a part of this case, at least one of whom suffers from autism.
[2] A more detailed account of the early volatile history of the parties is set forth in my Opinion filed at 1692 WDA 2016 in response to Mother's appeal of that Order.

1

**24**

custody on a week on /week off basis in the summer. Since 2016, numerous motions and pleadings have been filed, including the four instant contempt petitions. Ultimately, Father filed for modification of the 2016 Order, seeking a reduction in Mother's custody time.

At trial in March of 2021, I heard from Mother, Father, Child, and Paternal Grandfather, with whom Father and Child live. A North Strabane police officer also testified regarding a July 7, 2019, incident where Mother left her children unattended in a Burger King. Throughout the proceedings, Mother's testimony was often contradictory, and, in some cases, I deemed it to be fabricated. The other witnesses, including Child, testified credibly

On April 21, 2021, I read my factor analysis into the record.[3] I entered my Custody Order on May 3, 2021, giving Father sole legal custody, reducing Mother's overnight custody to every other weekend year-round, and eliminating Mother's mid-week visits. The same Order set forth my contempt findings and sanctions. Mother filed her Notice of Appeal and Statement of Matters Complained of on June 2, 2021. Mother's rather rambling 1925(b) Statement is ten pages long and will not be fully set forth here.

## Discussion

Because of the high level of acrimony in this case and the resultant numerous docket entries, this Court is very familiar with both parents. The high level of conflict which was present between the parties five years ago has not abated, and I found, as will be discussed below, that this conflict is almost solely perpetrated by Mother. I also found, as will be discussed in more detail that, although Child appears to be doing well, numerous concerns exist regarding

---

[3] Mother had to be removed from the remote hearing due to her failure to follow my admonishments and those of her lawyer to keep silent

2

25

Mother's parenting, and the positions in which she puts Child which I determined could best be remedied through a reduction in Mother's custody

In Mother's 1925(b) Statement, she makes several arguments regarding my Order and reasoning which are simply unsupported by the record. She claims I made a finding of parental alienation, which I did not, though I found that Mother spoke to Child disparagingly of Father. She likewise claims I made a specific finding of Mother's mental illness – again, I did not, although I did speculate that Mother needs therapy to help her modify her behaviors.

Most notably, Mother erroneously conflates my custody and contempt findings. She repeatedly asserts in her 1925(b) Statement that I reduced her custody time as "punishment" for her contempt. To the contrary, I reduced Mother's custody time because my analysis of the custody factors, when applied to the facts of this case, led to the conclusion that reducing Mother's custody time was in Child's best interest for several reasons.

Mother's Lack of Credibility

Before beginning to address Mother's arguments on appeal, I first note that I did not find a great deal of Mother's testimony to be credible. As one example: Mother is a nail technician by trade but testified she is currently unemployed. She further testified that she took Child to a nail salon solely to get Child's nails painted and not to work (TR. P. 122-123). Child, however, testified they went more to the salon than once, they were there for hours, and that Mother worked and was paid for doing manicures and pedicures while Child folded towels for which she was paid a dollar (TR p. 176-178). I did not find it overly objectionable that Mother took Child to work with her, but her lies about it put her credibility in question.

3

26

In another more serious example, Mother left her children in a Burger King while she went to a casino on July 7, 2019.[4] The police were called by the restaurant staff after the children had been there for hours and the shop was closing.[5] Although there was documentary evidence by the North Strabane police officer that Mother had been gambling in a casino during the time in question (TR. P. 29-36), she claimed to only have left the children for 15 minutes to go to an ATM to get money for a hotel room due to a utility issue in her home. She further argued that the manager of the Burger King was lying to bolster Father's case. This level of neglect was very troubling to me but so too was the lying about it.

There were numerous times at trial where I found Mother not to be credible. When confronted with the inconsistency of her testimony, Mother would simply find someone to blame besides herself. Mother's lack of credibility made it even her simplest testimony suspect.

## Contempt

Much as Mother did in her previous appeal, she argues that I reduced her custody time to "punish" her for past behavior – in this instance for her contempt of previous Orders. Mother is simply incorrect. The instant Custody Order is not "punishment" of Mother. To the contrary, it was the testimony regarding Mother's current behavior as it relates to Child's best interests that shaped my Order, as it was in 2016.

Mother first argues that it was error for me to schedule "a combined custody modification hearing with a contempt hearing" as it "accorded the Court the opportunity to punish Mother for contempt with deprivation of custody time,

---

[4] Mother argues in her 1925(b) Statement that this does not constitute neglect because the oldest child is old enough to be in charge. That child, however, suffers from mental disability, and, according to the report from the Burger King employees and the police officer, was in distress while there, not looking after his 8-year-old sibling (TR. P. 35, 115)

[5] The caller from Burger King indicated that Mother had done this before (TR. P. 114)

4

27

which is manifestly improper and not in the best interest of the Child." Mother continues, "ordinarily, custody contempt matters in Allegheny County are managed by Special Master Hearing Officers to avoid this conflict." These statements are not only without merit, they are erroneous and I find it rather shocking that an experienced attorney drafted them.

Custody contempt matters are often handled by Masters in Allegheny County, not to prevent judges from experiencing what Mother asserts is an "unavoidable" conflict, but for calendar control purposes. When, as here, a modification and a motion for contempt in custody are pending simultaneously, they are heard together. To do otherwise would be a waste of court resources. The implication that a sitting judge cannot hear two issues at one time without being fundamentally unfair is ludicrous. There are 67 counties in Pennsylvania, are those without master's trampling on parental rights as a matter of course? The argument is specious.

Mother then argues that "the Court cannot demonstrate how deprivation of custody time would cure the issues of alleged contempt and that the allegations of contempt were not "sufficiently serious or severe to justify deprivation of custody time." Both of these sentences are true but have as much to do with this case as the sentence, "The sky is blue." I did not deprive Mother of custody time as a remedy for her contempt.

Mother was found in contempt for not paying Father money she was court ordered to pay, for calling the police to assist with custody exchanges though ordered not to do so, for withholding Child during Father's Thanksgiving custody time, and for repeatedly violating the Court Ordered exchange location. For these violations, I imposed sanctions at Paragraphs 8-11 of my Order, all of which were monetary and none of which include deprivation of custody.

5

28

Accordingly, Mother's repeated assertions that I erred by reducing her custody time as punishment for contempt are belied by the very Order she appeals and should be dismissed as without merit.

Mother argues that my contempt findings were not supported by the evidence. Again, this is unfounded. With regard to the July 23, 2019, Order requiring Mother to reimburse Father for the $200.00 he had to wire her so she and Child could return from a Florida vacation,[6] Mother introduced a receipt for payment purportedly signed by Father. Father denied it was his signature and I believed Father, finding Mother's account to be a fabrication as she never raised this purported receipt as a defense when she had previous opportunity to do so. (TR. P 73-75)

I also found Mother in contempt for continuing to call the police for custody exchanges, after she was ordered to cease doing so on April 10, 2020. Father testified that on May 29, 2020, Mother arrived at Father's home to take Child on a day which was not her custody day. When Father refused, Mother called the police despite the Order. (TR. P. 16-17). Mother did not deny this.

A third contempt finding arose from Mother withholding the Child from Father on his Thanksgiving custody time in 2020. The 2016 Order provided Mother with custody every Thanksgiving Day. Twice in the past, Father agreed to let Mother keep Child for the entire weekend, but he did not agree to do so when Mother asked him to in 2020. Mother kept her anyway and left on a vacation. (TR. P. 146-148). I did not credit Mother's assertion that she was confused and found, instead that she knowingly violated the Order.

---

[6] Mother did not give Father the requisite notice for this vacation and then presented a motion to another judge to get permission to go. Father argued that he did not believe Mother had the money to go. She was given permission, took Child to Florida, and then did not have the money to return. Father wired her $200.00 for gas and tolls to get home. (TR. P. 22-28)

6

**29**

Lastly, due to the hostility between the parties - primarily Mother's angry outbursts at Father, the 2016 Order provided for exchanges at a police station. Mother repeatedly requested Father come to an exchange elsewhere. Often, when he did so, she would still not have Child ready, or would be at another location, or would otherwise thwart Father coming into custody There was no credible explanation for this behavior, and I therefore found Mother in contempt of this provision.

Additionally, I provided in Paragraph 3c that, going forward, if Mother did not have Child ready for exchanges into Father's custody, she would forfeit some of her upcoming custody. Mother complains that I accorded Father "the opportunity to summarily punish Mother with removal of custody time if she prospectively violates custody exchange provisions." As Mother has regularly engaged in sending Father on wild goose chases to retrieve Child which results not just in annoyance for Father but is detrimental to Child, I justifiably fashioned this consequence to deter further contempt which I am imposing, not Father.

Accordingly, my findings of contempt were supported by the evidence adduced at trial and the sanctions imposed were appropriate. Mother's complaints in this regard should be dismissed

## Custody

With regard to the reduction in her custody time, Mother claims that I reduced her custody time, not just due to her contempt, but that I did so due to "speculations" regarding Mother's "economic dishonesty which are entirely unsupported by the record, which are evidence of judicial hostility, and which are simply not remedied by shortening parenting time."

I do suspect a certain amount of economic dishonesty in light of Mother's claims that she is unemployed despite evidence that she is working. But this is not what led me to reduce Mother's custody time. I reduced her custody time

7

because my analysis of the custody factors so strongly favored Father and because Mother neglects Child in a number of ways – including not providing her with sufficient food (TR. P. 47), not attending to Child's hygiene (TR. P. 65, 73), not providing her with a feeling of being cared for, leaving Child and her siblings unattended in hotel pools and other locations while she gambles, not assisting with school or homework (TR. P. 8), living in a home which even Child finds is too unkempt, and for causing continued drama and hostility so as to disrupt the feelings of security Child needs.

After hearing the evidence, I determined that the level of strife caused by Mother is negatively impacting Child as she becomes more aware of it. Based on the testimony and evidence before me and the demeanor of the parties during trial, I found Mother to be responsible for the parties' volatile interactions. In my Opinion at 1692 WDA 2016, I wrote:

> "At trial, despite being admonished by me and her attorney, Mother could not contain her outbursts and overly dramatic reactions to testimony with which she disagreed. Father credibly testified that Mother purposely and spitefully made exchanges difficult, changing locations and times, sometimes for hours, despite knowing Father was already in the car."

I do not find that much has changed in that regard. That sort of hostility, and volatile behavior affects children in a negative way. Child testified that Mother starts the fights, (TR. p. 170), Mother is mean (TR. p 171-173), and that she finds Mother's behavior embarrassing (TR. p. 187).

Both Father and Child testified that Mother does not help Child with homework or make sure she is ready for school; Father does. On the Wednesday nights when Mother had Child for her mid-week visitation, she often did not feed Child dinner, she caused the exchanges to be late and chaotic, and did not make sure Child's homework was done. All of this resulted in a later bedtime at Father's house since, after getting home late, he had to feed Child, bathe her, and make sure her homework was completed. Child was then tired when sent to

8

31

school on Thursday. (TR. p. 9-13). Accordingly, I did not find it to be in Child's best interest to continue the Wednesday visitation with Mother.

As to the reduction in the remainder of Mother's custody time, I was particularly troubled by Mother's habitual neglect. In addition to the incident at Burger King, Child testified that, when on vacation, Mother stayed in the hotel while Child and her siblings were on their own at the pool (TR. p. 173-175), that they stayed alone in casino hotel rooms while Mother gambled (TR. p. 175-176). During Mother's summer custody week in July of 2019 when the Burger King incident occurred, credible evidence was presented that Mother was in a casino gambling four days out of that week (TR. p. 40-41).

Child also testified that her Mother's home was dirty, that the dogs urinated and defecated throughout the house and that it smelled bad (TR. p. 180-182), and that she would not want her friends to come over because it is too dirty. (TR. p. 183). Father testified that Child returned from Mothers unkempt and not bathed. Child testified that she doesn't shower at Mother's house because the shower is too dirty and she doesn't brush her teeth because her toothbrush is dirty. (TR. p 193).

Father testified that Paternal Grandfather cooks great meals for the family. Child testified her Mother does not cook and that they eat McDonald's food at her Mother's house (TR. p. 194-195).

When asked what would make things better at her Mother's, Child responded "If she was nicer, and the house was cleaner and she would give me more food that's good." (TR. p. 198). When asked if she felt safe in each parent's home, Child answered in the affirmative. But she said, although she felt safe, she did not feel "taken care of" at her Mother's. (TR. p. 200).

I did not find that Child was adequately taken care of at her Mother's either. While I would not remove Mother from Child's life entirely, as the two love

9

each other and Child has a relationship with her siblings that should not be ignored, I found it was in her best interest to have more time at her Father's house where she can feel both safe and taken care of by a parent.

## Custody Factors

I am required to review the statutory factors enumerated at 23 Pa. C.S.A. 5328 and apply them to the facts of the case. Of those factors, many of which go to the need for stability in a child's life, I found a number favored Father. The need for stability and continuity is only one factor among those at 23 Pa.C.S.A. § 5328(a) that a court must consider when making a custody ruling. Moreover, the amount of weight that a court places on any one factor is almost entirely discretionary. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa.Super. 2013). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case". *O.G. v A.B.*, 234 A.3d 766, (Pa.Super.) (2020). In this case, I found stability to be extremely important.

On the other hand, Father has demonstrated that he is willing to do whatever he can to keep peace, even when Mother's behavior has been outrageous. I found that the stability of Father's life and his care for Child makes his the home where Child can feel safe and cared for

Mother argues that I did not consider the negative effect of limiting Child's time with her siblings. I did consider that; I know that Child is close with her siblings, and I am aware that Child will not spend as much time with them under the current Order. As they have a close bond, I do not expect that bond to break.

This was not an Order I entered without consideration of all the factors and factor 6 concerning siblings was considered. I simply gave more weight to factors 1,2,3,4, and 13, all of which more of an effect on the stability needed in Child's life. And while Child did not verbalize a specific preference as is contemplated

10

33

by factor 7, other than that she preferred Father's house for all holidays, Child's testimony demonstrated a preference for Father's custodial time.

## Statements Regarding Mental Health

Mother claims that I "engaged in shocking speculation concerning Mother's medical and psychological status." On April 21, I stated, "Mom has been doing the same thing over and over again expecting a different result, expecting some result that she fantasizes about, but she is not getting it and she doesn't seem to understand why." (TR. 4/21 p. 10). I suggested, as I and other have in the past, that Mother seek therapy.

After Mother was removed from the remote hearing for outbursts, I did speculate that Mother may have a cognitive or psychological condition which is preventing her from changing her behavior for the better but stated that I do not know what the basis of that is. (TR. 4/21 p. 18). Mother has been instructed numerous times since 2013 to seek individual counseling to gain coping skills and improve her interactions with Father. I offered my opinions on the matter in an attempt to help Mother by encouraging her to get help. Even if this could be interpreted as an overreach, it was not a deciding factor in my custody determination. It is Mother's behavior, and how it affects her child, that influenced my determination, along with my weighing of the custody factors.

## Evidentiary Support

Lastly, Mother argues that my findings and determination of the facts are not supported by the record. In fact, the evidence I relied on to make my decision was the behavior of the parties and, to a great extent, Mother's own testimony. The testimony and evidence demonstrated that Mother left Child uncared for while she gambled or engaged in other activities, even when she was on vacation away from home with her children. That in itself supports my determination to reduce Mother's custody time.

11

**34**

There was additional testimony which supported a change in custody. Child testified she does not get enough to eat at Mother's house and that it is too dirty there for her to take a shower or brush her teeth. Father testified that Mother continues to shout and scream at him over perceived slights. Child testified that Mother tells her that her Father is "a bad dad," (TR. p. 171).

Moreover, Mother does not seem to recognize her own bad behavior, asserting that it is not she who is acting inappropriately by leaving her children unattended or promising gifts if Child will ignore Father. Instead she claims Father brainwashes Child, or others hope to harm her.

## Conclusion

In reaching my decision, I found a majority of the statutory custody factors heavily favored Father. I found that Child needs the stability and safety which Father offers, while still maintaining a relationship with the Mother she loves. Because I found the evidence demonstrated that, despite loving Child, Mother could not adequately parent her, I found Father's household provided the best environment for Child and that a reduction in Mother's custody time was warranted. My decision was based on the testimony of the parties, the evidence presented and my evaluation of the parties' credibility.

Because my May 3, 2021, Order is based on an appropriate and thorough consideration of the statutorily mandated factors, is supported the evidence of record, and is firmly in Child's best interests, it should be affirmed.

BY THE COURT:

*Cathleen Bubash*

**3 5**