J-S01001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TAMRA A. EATMON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LYNN EATMON | : | |
| | : | |
| Appellant | : | No. 612 WDA 2025 |

Appeal from the Order Entered April 29, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-17-008955

BEFORE: BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED: March 3, 2026**

Lynn Eatmon ("Father") appeals *pro se* from the April 29, 2025 order delineating the respective rights of Tamra A. Eatmon ("Mother") and Father regarding the custody of their child, M.E.[1] We affirm.

We glean the following history from the certified record. The parties married in July 2006. Father worked in IT support at Carnegie Mellon University, while Mother was licensed as a registered nurse. M.E. was born in May 2012. The three lived together until late 2017, when Mother filed a complaint for custody and relocated M.E. to a newly-purchased house,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The order is dated April 23, 2025, but was not entered through a notation on the docket of service upon the parties until April 29, 2025.

deeming their marital home unsafe in its existing condition and having lost patience with Father's failure to complete necessary renovations. Before long, Father rejoined the family in the new residence. Mother filed another custody complaint in September 2021, but that was dismissed in January 2022 when neither party appeared for mediation.

Mother and M.E. left the new marital home in December 2022, this time to take up residence in a homeless shelter.[2] This resulted in M.E.'s removal from her elementary school, where she had participated in a gifted program, in favor of cyber schooling. Eventually, M.E. enrolled in a charter school of Father's choosing. However, that school did not have a gifted program. **See** N.T. Trial, 4/22/25, at 72.

Mother filed a new custody complaint in April 2023 seeking sole physical custody of M.E., and Father counterclaimed for sole physical and sole legal custody. The parties attended a conciliation before a hearing officer in July 2023, with Mother having counsel and Father proceeding *pro se*. The result was an interim order providing for shared legal custody, and Mother exercising primary physical custody with Father having M.E. for eleven hours each

_____

[2] The shelter in question provided apartments for homeless families and was not geared toward assisting victims of abuse. While Mother has filed two Protection from Abuse ("PFA") petitions against Father, neither resulted in a finding that Father had perpetrated abuse on Mother or M.E., as Mother withdrew the first and the second, which we reference *infra*, was denied by the trial court after a hearing.

Saturday. Mother began residing at her father's home with M.E. at that time and filed for divorce the following month.

The litigation continued with the trial court ordering a full custody evaluation and scheduling a custody trial to commence on July 26, 2024. On that date, the parties instead agreed to a consent order by which Father's periods of physical custody of M.E. gradually increased to an arrangement of shared custody on a 5-2-2-5 basis. The court had cause to revisit that custody arrangement on multiple occasions in the months that followed, whether through planned review hearings or in deciding myriad motions presented by the parties, most of them pursued by Father, who was again acting *pro se* after a brief period of being represented by counsel. This custody schedule was disrupted by the entry of a temporary PFA order that was ultimately denied on its merits by the trial court. As Mother had sought a modification of custody in connection with her PFA petition, the court ultimately held a full custody trial on April 21 and 22, 2025.

At the outset of the trial, the court conducted an on-the-record, in camera interview of M.E., who was then in seventh grade and on the verge of turning thirteen years old. M.E. indicated that she did not like the current custody schedule, and would prefer to stay with Mother, seeing Father only when M.E. chose. When asked to instead offer an interval that the court could specify in the custody order, M.E. suggested once per year. She indicated that Mother demonstrated more concern for M.E.'s mental health, showing

more respect for boundaries and allowing her more freedom to process her feelings.

Father then put on his evidence, which for the most part attacked Mother's parenting performance rather than displaying his parenting acumen. In that vein, Father's case largely consisted of a haphazard proffer of documents, often incomplete or undated, reflecting specific instances of Mother's ostensible parenting deficiencies.[3]   The major concern Father highlighted was the number of times M.E. was absent or tardy for school. However, his exhibit purporting to establish her attendance record was unintelligible because the school's website display was color-coded but his printout was in black and white.  *See* N.T. Trial, 4/21/25, at 40-42.  Summing up, Father asserted that his documents suggested that Mother was not providing M.E. the stable environment and schooling that she needed. Therefore, he should be given primary custody and would ensure that Mother had "generous access" to M.E.  *Id*. at 113-14.

On cross-examination, Father was argumentative, refusing to concede simple facts, such as that he had not gone to medical school as had the doctor who recommended that M.E. participate in a partial hospitalization program ("PHP") to treat her anxiety and moderately severe depression.  *Id*. at 136-

_____

[3] For example, as proof of Mother's inattentiveness to M.E.'s nutritional needs, Father offered an undated message from Mother asking him to take lunch to M.E. on one occasion.  Another exhibit demonstrated that M.E. missed a chiropractor appointment at some point in 2024.

38. In rejecting the representation that all his evidence about issues with communication and custody exchanges was stale since it occurred before the July 2024 consent order, Father noted that one of his exhibits concerned a day in August 2024 when Mother had incoming calls disabled when he tried to contact her. *Id*. at 179.

Father further demonstrated a lack of knowledge of the law or appreciation of the impact of his proposed custodial arrangement. For example, he suggested that his request to grant Mother "limited custody at the discretion of [Father]" to make decisions about M.E.'s education and medical care was somehow different than granting him sole legal custody. *Id*. at 185-86. Similarly, while Father proposed that the custody order indicate that law enforcement shall assist in enforcing physical custody transfers, he admitted that he had "no idea" how that would work and disclaimed awareness that it meant police would be empowered to remove M.E. from Mother's custody against M.E.'s will. *Id*. at 175. Father also claimed ignorance of such things as M.E.'s feelings about the ideal custody arrangement, her sleep habits, and whose help she prefers regarding school work.

Turning to Mother's case, she informed the court of the activities she and M.E. engage in during her periods of custody, such as gardening and art projects, as well as chores M.E. has like keeping her room clean and organized, as well as helping with cooking and dishes. *See* N.T. Trial, 4/22/25, at 33-35. M.E. also enjoyed peer companionship while in Mother's care, having a

friend for sleepovers and riding bikes, and participating in activities such as an Easter egg hunt. *Id*. at 33. Mother attested that she resided in a two-bedroom apartment since January 2025 and intended to stay there for the long term, with friends and family in the area as resources to assist when she returned to working as a nurse.[4] *Id*. at 67, 69, 74. Despite expressing her belief that having M.E. reside primarily with her was in M.E.'s best interests, Mother recognized the importance of M.E.'s relationship with Father, and provided her with a phone she could use to call or text him any time she desired. *Id*. at 69-70.

Mother conceded that M.E.'s school attendance record was concerning, but noted that improvements had been made now that they are in stable housing not far from M.E.'s charter school. Mother explained that the problem was that, while preparing for school, M.E. would become fixated on things such as her clothing not feeling right and temporarily shut down, delaying their departure. *Id*. at 15. Mother opined that if M.E. had access to the treatment and medication that her psychiatrist had recommended, but to

---

[4] Mother also struggles with anxiety and depression, which was exacerbated by the stress of the end of her marriage to Father. She was undergoing treatment and anticipated returning to her job with the Veterans' Administration. *See* N.T. Trial, 4/22/25, at 73-76.

which Father refused to consent, M.E. would be better able to focus instead of becoming bogged down.[5] *Id*. at 26-27.

The trial court explored this with Mother, questioning whether her belief that she was not heard caused her go the opposite extreme and overindulge M.E.'s feelings to the detriment of her "capability and the capacity to build a resilience within [her]self, not reliant on other people hearing [her]." *Id*. at 106. Mother acknowledged that but maintained her desire that M.E. be empowered; the court countered that "[s]ometimes you may just have a misbehaved teenager who needs to have discipline." *Id*. at 107.

Mother informed the court that she tried to have discussions with Father about these issues, but Father did not consider her point of view. Instead of it being a conversation, Father would give a monologue and then call Mother "defiant" or "ungodly" if she expressed a different point of view. *Id*. at 37-39. Mother observed Father exhibiting the same behavior when interacting with M.E., who tries to respectfully comply rather than trigger a lecture, but who has expressed homicidal and suicidal thoughts as a result of Father's haranguing. *Id*. at 39.

---

[5] While Father was unwilling to accept the recommendations of M.E.'s psychiatrist for medication and a PHP, because he believed that they were founded upon his alienation from M.E., he did not reach out to the doctor to ascertain the actual basis for the recommendation nor suggest another provider to examine M.E. and recommend treatment for her significant mental health needs. *See* N.T. Trial 4/21/25, at 184-85; N.T. Trial 4/22/25, at 92.

At bottom, Mother perceived that, rather than cooperating for M.E.'s best interests, Father was "out for blood," scrutinizing and documenting Mother's every minor non-compliance with the custody order in an attempt to win the litigation. *Id*. at 38-42. When it came to co-parenting generally, and specifically in assessing recommendations for M.E.'s mental health treatment, Father would not "accept any resolution . . . other than what he believes to be in her best interest." *Id*. at 79.

This sentiment was echoed by Ashley Revels, who had provided weekly co-parenting counseling to the parties from May to October 2024, and briefly at the beginning of 2025. Ms. Revels indicated that Mother was receptive to her feedback and incorporated her suggestions into the sessions. *Id*. at 149. Conversely, while Father would hear and understand the feedback Ms. Revels offered, he would disagree with it and refuse to implement her advice.[6] *Id*. Ms. Revels requested to speak to the parties' individual therapists, but Father was not receptive to that either. *Id*. at 152. When asked if co-parenting counseling should be resumed, Ms. Revels opined "that it eventually could benefit these parents, and if both of them were able to get their own individual counseling and the counselors were both individually able to determine that

---

[6] For example, Ms. Revels asked Father not to send Mother email correspondence because it was an overwhelming amount of information that could better be addressed in their sessions. However, "he was not open to no longer sending those e-mails, stating something to the effect [of] wanting to make sure she was fully informed of all aspects of his thought process and not wanting to keep her in the dark." N.T. Trial, 4/22/25, at 151.

they were ready to be able to be open to the other party." *Id*. at 153. However, without that, she did not anticipate that the counseling would be successful. *Id*.

The trial court did not rule from the bench at the close of trial. The next day, following a virtual session in which the court recited its findings as to the statutory custody factors, the court issued the custody order at issue in this appeal. It continued the parties' shared legal custody as to all matters except M.E.'s mental health treatment, over which Mother had sole authority. The court ordered the parties to follow the recommendations of M.E.'s health providers, specifically as to the suggested PHP. The court indicated that Mother had "a duty to inform and discuss and explain to Father" her choices "with respect to these limited decisions." Order, 4/29/25, at ¶ 1(i).

As to physical custody, the court maintained the 5-2-2-5 schedule during summers, but awarded Mother primary custody during the school year, with Father having M.E. every other weekend and for one overnight during his off week. *Id*. at ¶ 2(a), (b). The order further detailed vacation and holiday schedules, and provided that AppClose was to remain the parties' communication method, but was "not to be used for open dialogues and discussions, nor recitations and recantations of perceived wrong doings or positions." *Id*. at ¶¶ 3, 5, 6(a). The court also instructed the parties to maintain individual therapy and follow the recommendations of their

therapists, including the resumption of co-parenting counseling when appropriate. *Id*. at ¶ 7.

Father then filed seven motions, including those seeking reconsideration, a new trial, recusal of the trial judge, a hold on M.E.'s enrollment in the PHP, and requests for the court to review documents that Father failed to offer at trial, such as the custody evaluation, and those the court excluded pursuant to the Rules of Evidence, including a police report Mother objected to as hearsay.[7] The court denied all of Father's motions.

Father filed a timely notice of appeal, but did not include a statement of errors complained of on appeal as required by Pa.R.A.P. 1925(a)(2)(i). Accordingly, the trial court entered an order pursuant to Rule 1925(b), and Father ultimately submitted a statement listing twenty-three grievances, some vague or pertinent to prior proceedings in the case.[8] The trial court supplied a Rule 1925(a) opinion addressing the preserved issues that it was able to discern.

_____

[7] Not only was the custody evaluation report not offered into evidence at trial, but we have not uncovered it anywhere within the record certified to this Court. However, as we mention *infra*, it appears that the trial court received the evaluation at some point and considered it in fashioning its order.

[8] Father did not file his statement within twenty-one days of the filing of the order. However, the docket entry does not note when the order was served upon the parties. Accordingly, we decline to find waiver based on the timing of his filing.

Prior to the appeal being assigned to the instant panel, Father filed applications for relief from this Court on June 11 and 24; August 6, 7, 15, and 21; September 15, 19, and 21; and November 6 and 14, 2025. This Court denied every one of them, with the final denial order directing our Prothonotary not to accept any further *pro se* applications from Father. **See** Order, 12/12/25.

In his appellate brief, Father has narrowed his complaints to the following four issues:

1. Did the trial court abuse its discretion by materially reducing [Father]'s custodial time and granting [Mother] sole legal custody over mental health decisions without adequate findings under 23 Pa.C.S. §§ 5328(a) and 5338(a)?

2. Did the court err in failing to address evidence of educational neglect, truancy, and the child's removal from a gifted program?

3. Did the trial court fail to properly consider the court-ordered custody evaluation, and do circumstances surrounding the consent order cast doubt on procedural fairness?

4. Did the court's pattern of discretionary rulings—including evidentiary exclusions, enforcement disparities, and unchecked violations—undermine the fairness of the proceedings?

Father's brief at 3-4.

Before we address Father's challenges to the court's ruling, we consider Mother's contention that other procedural defects warrant dismissal of this appeal. She notes that Father failed to file a reproduced record, and he disputes evidentiary rulings with "no reference to the record of the items of

- 11 -

which he complains were 'excluded.'" Mother's brief at 6-7. She further observes that, in contravention of Pa.R.A.P. 2119(c) and (b), Father's "entire argument is a list of grievances with little or no citation to the record or any legal authority and is devoid of any citations to the record to support said argument." *Id*. at 7.

Father responds to Mother's argument by stating: "The Superior Court disfavors dismissal of custody appeals on technical grounds where substantive issues are presented. *See M.E.V. v. F.P.W.*, 100 A.3d 670, 681 (Pa.Super. 2014) (trial courts must consider all sixteen custody factors and articulate their reasoning to permit review)."[9] Father's reply brief at 2.

It is well-settled that, "although this Court is willing to construe liberally materials filed by a *pro se* litigant, a *pro se* appellant enjoys no special benefit." *Commonwealth v. Tchirkow*, 160 A.3d 798, 804 (Pa.Super. 2017). "A *pro se* litigant must comply with the procedural rules set forth in the Pennsylvania Rules of the Court." *Smithson v. Columbia Gas of PA/NiSource*, 264 A.3d 755, 760 (Pa.Super. 2021) (cleaned up). "Any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." *Id*. (cleaned up).

---

[9] Although the *M.E.V.* decision indeed enforced a trial court's obligation to discuss each factor distinctly rather than *en masse*, it does not support Father's assertion that this Court should overlook an appellant's failure to comply with the Rules of Appellate Procedure.

While Father plainly failed to adhere to many requirements of the Rules of Appellate Procedure, we decline to sanction him with summary dismissal of the appeal. To the extent that Father's noncompliance has left this Court unable to conduct meaningful review, we will deem those arguments waived. *See*, *e.g.*, *Commonwealth v. Gilliam*, 249 A.3d 257, 271 (Pa.Super. 2021) ("It is not the role of this Court to develop Appellant's argument."). However, we will consider the merits of those issues that the trial court addressed in its Rule 1925(a) opinion and are sufficiently developed in his brief.

The following legal principles govern our consideration of this appeal:

Our standard of review over a custody order is for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Rogowski v. Kirven*, 291 A.3d 50, 60-61 (Pa.Super. 2023) (cleaned up).

Pursuant to 23 Pa.C.S. § 5328, a court ordering any form of custody is required to ascertain the best interest of the child involved by examining

enumerated factors. In particular, in entering its custody order, the trial court must assess the following factors, with weighted consideration to those affecting the safety of the child:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in [§] 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's

deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a) (effective August 13, 2024, to August 28, 2025).[10]

It is well-settled that "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa.Super. 2013). While a trial court must consider each of the statutory factors, "the amount of weight

---

[10] Legislation effective on August 29, 2025, modified the custody factors. However, we examine the version of the statute in place in April 2025, when the court entered its order.

that a court places on any one factor is almost entirely discretionary." ***O.G. v. A.B.***, 234 A.3d 766, 777 (Pa.Super. 2020); ***see also D.Q. v. K.K.***, 241 A.3d 1112, 1117 (Pa.Super. 2020) ("The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned." (cleaned up)).

A critical component of appellate review is recognition that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." ***Id***. (cleaned up). Hence, it is not our function "to determine whether the trial court reached the right decision; rather, we must consider whether, based on the evidence presented, given due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion[.]" ***King v. King***, 889 A.2d 630, 632 (Pa.Super. 2005) (cleaned up).

Mindful of these principles, we turn to Father's claims of error. As his first two issues assail the trial court's application of § 5328(a), we consider its analysis of the statutory factors, which it related thusly:

> I found that both parties could ensure the safety of the child, so factor 1 favored neither party. I found factors 2.1 and 2.2 inapplicable, favoring neither party. Factor 2.3 also favored neither as I believe both were likely to encourage and permit frequent contact with the other party and that M.E. would be safe with either parent. I considered Father's argument that Mother secured a PFA specifically to keep him from seeing his daughter, but did not find that claim supported by the evidence. That

- 16 -

incident had more to do with M.E.'s anxiety and mental health struggles.

Mother is favored by factor 3. Based on the evidence presented and the parties' demeanor, I believed that Mother was more likely to attend to the emotional needs of M.E. in that she did so in a more child-friendly manner as opposed to Father's more adult-driven approach. Factor 4, the need for continuity and stability in the child's education, family life and community life, was a major factor in my analysis and favored Mother. I increased Father's time with M.E. from one day per week to a 50/50 schedule in 2024. M.E's mental health, however, has not improved, and she has expressed a desire not to see Father at all. In addition, Father has opposed the mental health treatment M.E. clearly needs. This refusal on Father's part is a core problem in this matter.

Factors 5 and 6 are not applicable. As for the preference of M.E., factor 7, although I find her to be very intelligent, she is only [twelve] and I cannot rely completely on her stated preference[,] which was to never see her Father because of the way he deals with her emotional issues. While I did not consider her testimony dispositive on factor 7 because of her age, I did consider and weigh her testimony about her relationship with her father in addressing the other factors.

I have not seen evidence of attempts by either party to alienate M.E. from the other parent. (Factor 8). I believe that M.E.'s alienation from Father is a product of his behavior and, especially, his resistance to any kind of medication.

While I have no doubt that both parents love their daughter, Mother has demonstrated a better ability to address M.E.'s emotional needs. (Factor 9). Factor 10, which party is more likely to attend to the daily physical, emotional, developmental and special need of the child, strongly favors Mother. Factors 11 and 12 are not applicable.

Factor 13, the level of conflict between the parties, is a major issue in my decision. Father does not seem capable of modifying his problematic behaviors, even when I encourage that he does so or when Mother or the child's therapist recommends something different than his preference. Finally, I found that

factors 14 and 15 favored neither party. I also did not identify other relevant factors that influenced my decision. (Factor 16).

I weighed these factors, the evidence presented, and what I have learned about the parties as this litigation has progressed. I concluded that the order entered on April 23, 2025, including the slight change in physical custody and giving Mother sole control over M.E.'s mental health treatment decisions, was in the best interests of M.E. Father still has significant time with M.E., with only a reduction when school is in session. And because of his refusal to cooperate with providing appropriate help to address M.E.'s emotional and mental health issues, Mother had to be given the authority to act unilaterally on such matters.

Trial Court Opinion, 7/9/25, at 4-6 (cleaned up).

Disputes concerning three particular factors comprise Father's challenge to the court's application of § 5328(a). Citing M.E.'s school attendance records and the testimony about her tardiness and absences, Father argues that the court's finding in favor of Mother as to the fourth factor were faulty because the court "failed to weigh substantial evidence showing that continuity in the child's education had been compromised during [Mother's] custodial time." Father's brief at 6. He also cites M.E.'s removal from her elementary school's gifted program when she and Mother left the marital residence in 2022 as proof that Mother undermined M.E.'s educational stability. *Id*.

As to the tenth factor involving the child's daily needs, Father again condemns Mother's track record of not ensuring M.E.'s timely school attendance and underscores his evidence that he provided a more consistent daily routine and better made certain that M.E. completed her homework. *Id*.

Father further disputes the court's assessment of the thirteenth factor insofar as it placed the blame on him for the ongoing conflict between the parties, citing his testimony that he "sought collaborative medical decision-making and objected only to a specific program's suitability." *Id*.

Sticking with this theme, in his second issue, Father again stresses the gifted program removal and the more recent attendance-record concerns and maintains that "the court's silence on these points undermines the integrity of its analysis." *Id*

Father is entitled to no relief on these claims. His arguments do not identify factual findings that are unsupported by the record; they merely suggest that the ultimate decision the court reached as to these factors is not warranted by the record. In other words, instead of identifying any abuse of discretion, Father "essentially ask[s] this Court to re-find facts, re-weigh evidence, and re-assess credibility. That is not our role." ***D.R.L. v. K.L.C.***, 216 A.3d 276, 286 (Pa.Super. 2019). Our review of the certified record, including the trial court's examination of witnesses during the custody trial, reveals that the court considered each of the factors and all the evidence properly before it, and reached a conclusion as to M.E.'s overall best interests that was well within its discretion.

Next, Father asserts that the trial court failed "to give proper weight to custody evaluation." Father's brief at 8 (capitalization altered). He argues that the court "glosse[d] over the evaluator's specific findings . . . without

stating why it rejected key conclusions[.]" ***Id***. The findings he emphasizes relate to school tardiness along with M.E.'s "need for consistent time with both parents to stabilize routines," and the hindrance to coordination caused by unilateral decision making.[11] ***Id***.

As our recitation above denotes, the record confirms that the trial court considered the relevant evidence and it was for the trial court, not this Court, to determine the proper weight to be assigned to each factor. ***See also*** Trial Court Opinion, 7/9/25, at 10-11 (indicating that the court "considered Father's evidence regarding M.E.'s troubling attendance record," as well as the custody evaluation, despite the absence of its formal admission at trial). That Father would weigh the evidence and the factors differently does not establish an abuse of discretion.

Without reference to the certified record, or the citation or discussion of any legal authority, Father next asserts that his consent to the prior custody order that was supplanted by the order *sub judice* was not voluntary. ***See*** Father's brief at 8. As the trial court aptly observed:

> Any concerns Father had with the July 26, 2024, consent order should have been raised at that time, either to [the trial court] or in an appeal. He took no action and cannot now seek to challenge that order. Moreover, any such challenge is moot since a new [o]rder has been entered.

_____

[11] We may only assume that these matters were mentioned in the evaluator's report since, as noted above, it was not offered into evidence at trial and it was not otherwise included in the certified record.

- 20 -

Trial Court Opinion, 7/9/25, at 10-11. We agree. The issue merits no relief.

Father's penultimate complaint is that the trial court improperly granted Mother sole legal custody as to M.E.'s mental health treatment and delegated "future legal custody to unspecified third parties" by ordering the parties to follow the recommendations of M.E.'s mental health providers. *See* Father's brief at 8.

The trial court did not address this matter in its opinion, as it was not included in Father's statement of errors complained of on appeal. Not only does he raise this issue for the first time on appeal, but he fails to develop his argument with citation to relevant authority. Accordingly, this issue is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *Nemirovsky v. Nemirovsky*, 776 A.2d 988, 994 (Pa.Super. 2001) (holding waiver applied to "cursory, four sentence argument" unsupported by citation to case law).

Father's final argument is, *in toto*, as follows:

Over the course of proceedings, several discretionary rulings consistently disadvantaged [Father]:

- Interim Custody: For nearly a year, [Father] was confined to minimal parenting time, weakening both his role and leverage.

- Evidentiary Rulings: Key documents (*e.g.*, school tardiness record) were excluded due to formatting despite prior submission in acceptable form.

- Weighting of Factors: Admissions by [Mother] regarding tardiness, lack of structure, and uncoordinated decision-making were not integrated into the court's factor findings.

- 21 -

- Post-Trial Orders: June 2025 withholding of custody based on ambiguous language in a follow-up order reflects risk of over-delegation.

These cumulative concerns point to a manifestly unreasonable application of discretion.

Father's brief at 9.

This raises both matters that we have already rejected above and new issues that are waived because they are neither developed by discussion of pertinent law nor anchored in the certified record such that we have any idea about what Father complains. Moreover, as we explained in denying some of Father's serial applications for relief, if he wished to challenge orders entered by the trial court after this appeal was filed, he had to separately and timely appeal those orders. *See* Order, 10/17/25. Thus, Father's final claim of error does not establish grounds for relief.

In sum, Father has presented us with no preserved, developed argument to convince us that the trial court's April 29, 2025 custody order was the product of an error of law or abuse of discretion. Accordingly, we have no basis to disturb it.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/3/2026